# 25-1782

*To Be Argued By*:
THOMAS S. BURNETT

## United States Court of Appeals
### FOR THE SECOND CIRCUIT
### Docket No. 25-1782

◄♦♦♦►

UNITED STATES OF AMERICA,

*Appellant,*

—v.—

AVRAHAM EISENBERG,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR THE UNITED STATES OF AMERICA

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

THOMAS S. BURNETT,
PETER J. DAVIS,
NATHAN REHN,
 *Assistant United States Attorneys*

**TABLE OF CONTENTS**

PAGE

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues Presented for Review . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Procedural History . . . . . . . . . . . . . . . . . . . . 2

    B.  Statement of Facts . . . . . . . . . . . . . . . . . . . . 4

        1.  The Government's Case. . . . . . . . . . . . 4

            a.  Mango Markets and the MNGO
               Token . . . . . . . . . . . . . . . . . . . . . . 4

            b.  Cryptocurrency Trading and MNGO
               Perpetuals . . . . . . . . . . . . . . . . . . . 5

            c.  Borrowing and Lending . . . . . . . . . 7

            d.  Eisenberg's Criminal Scheme . . . . 7

            e.  Eisenberg's Knowledge of
               Wrongdoing . . . . . . . . . . . . . . . . . 10

        2.  The Defense Case and Verdict . . . . . . 12

        3.  The Sentencing and the District Court's
            Post-Trial Order. . . . . . . . . . . . . . . . . 12

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . 13

ii

PAGE

ARGUMENT:

POINT I—The District Court Erred in Overturning the
Jury's Conclusion that Eisenberg Committed
Wire Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .   15

    B.  The Evidence Was Sufficient to Find that
Eisenberg Falsely Represented His Intention
to "Borrow." . . . . . . . . . . . . . . . . . . . . . . . . .   16

        1.  Relevant Facts . . . . . . . . . . . . . . . . . . .   16

        2.  Discussion. . . . . . . . . . . . . . . . . . . . . . .   19

    C.  The Evidence Was Sufficient to Find that
Eisenberg Falsely Represented The Value of
His Collateral. . . . . . . . . . . . . . . . . . . . . . . .   27

        1.  Relevant Facts . . . . . . . . . . . . . . . . . . .   28

        2.  Discussion. . . . . . . . . . . . . . . . . . . . . . .   29

    D.  The Evidence Was Sufficient to Conclude
that Eisenberg Executed a Scheme to
Defraud, Even If There Were No
Misrepresentation. . . . . . . . . . . . . . . . . . . . .   36

POINT II—The District Court Erred in Vacating the
Jury's Verdict for Improper Venue. . . . . . . . . . .   41

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .   41

    B.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   42

iii

PAGE

C.  Venue For Wire Fraud Was Proper in the Southern District of New York . . . . . .  46

D.  Venue For the Commodities Counts Was Proper in the Southern District of New York. . . . . . . . . . . . . . . . . . . . . . . . . . .  50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

## TABLE OF AUTHORITIES

*Cases*:

*Bridge Fin. Pty. v. RPE I Investor I, LLC,*
    23 Civ. 11230 (JSR), 2024 WL 1806414
    (S.D.N.Y. Apr. 25, 2024). . . . . . . . . . . . . . . . . . . . 23

*Carpenter v. United States,*
    484 U.S. 19 (1987). . . . . . . . . . . . . . . . . . . . . . . . 39

*Durland v. United States,*
    161 U.S. 306 (1896). . . . . . . . . . . . . . . . . . . . . . . 19

*In re Refco Capital Markets,*
    6 Civ. 643 (GEL), 2007 WL 2694469
    (S.D.N.Y. Sept. 13, 2007) . . . . . . . . . . . . . . . . 40, 41

*Kaloyeros v. United States,*
    143 S.Ct. 2490 (2023) . . . . . . . . . . . . . . . . . . . . . . 46

*Kousisis v. United States,*
    605 U.S. 114 (2025). . . . . . . . . . . . . . . . . . . . . 20, 22

*Liebowitz v. Cornell University,*
    584 F.3d 487 (2d Cir. 2009) . . . . . . . . . . . . . . . . 23

iv

PAGE

*McNally v. United States*,
483 U.S. 350 (1987). . . . . . . . . . . . . . . . 19, 25, 37

*Neder v. United States*,
527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . 38

*Prime Int'l Trading v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 51

*Schmuck v. United States*,
489 U.S. 705 (1989). . . . . . . . . . . . . . . . . . . 40, 49

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016) . . . . . . . . . . . . . . 20, 25

*United States v. Abbas*,
100 F.4th 267 (1st Cir. 2024) . . . . . . . . . . . . . . . . 47

*United States v. Abdallah*,
528 F. App'x 79 (2d Cir. 2013) . . . . . . . . . . . . . . 54

*United States v. Altman*,
48 F.3d 96 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 39

*United States v. Amrep Corp.*,
560 F.2d 539 (2d Cir. 1977) . . . . . . . . . . . . . . . . 20

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . 16

*United States v. Arslanouk*,
853 F. App'x 714 (2d Cir. 2021) . . . . . . . . . . . . . . 40

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2008) . . . . . . . . . . . . . . . . 29

v

PAGE

*United States v. Beech-Nut Nutrition Corp.*,
  871 F.2d 1181 (2d Cir. 1989) . . . . . . . . . . . . . 41, 53

*United States v. Bonnett*,
  877 F.2d 1450 (10th Cir. 1989) . . . . . . . . . . . . . 39

*United States v. Burnett*,
  10 F.3d 74 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 39

*United States v. Buyer*,
  2025 WL 855773 (2d Cir. Mar. 19, 2025) . . . 51, 55

*United States v. Calonge*,
  74 F.4th 31 (2d Cir. 2023) . . . . . . . . . . . . . . . . 48

*United States v. Chow*,
  993 F.3d 125 (2d Cir. 2021) . . . . . . . . . . 52, 55, 56

*United States v. Clausen*,
  792 F.2d 102 (8th Cir. 1986) . . . . . . . . . . . . . . . 37

*United States v. Colton*,
  231 F.3d 890 (4th Cir. 2000) . . . . . . . . . . . . . . . 37

*United States v. Connolly*,
  24 F.4th 821 (2d Cir. 2022) . . . . . . . 32, 34, 35, 36

*United States v. Cores*,
  356 U.S. 405 (1958). . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Coté*,
  54 F.3d 88 (2d Cir. 2008) . . . . . . . . . . . . . . . 15, 16

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) . . . . . . . . . . . . . . . 16

vi

PAGE

*United States v. Dagar,*
    No. 24-2239, 2025 WL 2553533
    (2d Cir. Sept. 5, 2025). . . . . . . . . . . . . . .  51, 52, 56

*United States v. Doherty,*
    969 F.2d 425 (7th Cir. 1992) . . . . . . . . . . . . . . . 39

*United States v. Eppolito,*
    543 F.3d 25 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 32

*United States v. Hild,*
    147 F.4th 103 (2d Cir. 2025) . . . . . . . . .  14, 36, 37

*United States v. Jabar,*
    19 F.4th 66 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 22

*United States v. Khalupsky,*
    5 F.4th 279 (2d Cir. 2021) . . . . . . . . . . .  52, 53, 55

*United States v. Kim,*
    246 F.3d 186 (2d Cir. 2001) . . . . . . . . . . . . . . . . 46

*United States v. Kitchen,*
    No. 99-1576, 2000 WL 553884
    (2d Cir. May 3, 2000) . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Kurleman,*
    736 F.3d 439 (6th Cir. 2013) . . . . . . . . . . . . . . . . 37

*United States v. Lange,*
    834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 51

*United States v. Levis,*
    488 F. App'x 481 (2d Cir. 2012) . . . . . . . . . . . . . 50

*United States v. Moses,*
    109 F.4th 107 (2d Cir. 2024) . . . . . . . . . . . . . . . . 15

vii

PAGE

*United States v. Pacilio,*
  85 F.4th 450 (7th Cir. 2023). . . . . . . . . . . . . . . 30, 39

*United States v. Percoco,*
  13 F.4th 158 (2d Cir. 2021) . . . . . . . . . . . . . . . . 46

*United States v. Petrossi,*
  786 F. App'x 286 (2d Cir. 2019) . . . . . . . . . . . 30, 33

*United States v. Phillips,*
  155 F.4th 102 (2d Cir. 2025) . . . . . . . . . . . . . . . 31

*United States v. Rafsky,*
  803 F.2d 105 (3d Cir. 1986) . . . . . . . . . . . . . . . . 39

*United States v. Ramirez,*
  420 F.3d 134 (2d Cir. 2005) . . . . . . . . . . . . . . . . 53

*United States v. Reed,*
  773 F.2d 477 (2d Cir. 1984) . . . . . . . . . . . . . . . . 42

*United States v. Regan,*
  937 F.2d 823 (2d Cir. 1991) . . . . . . . . . . . . . . . . 31

*United States v. Reifler,*
  446 F.3d 65 (2d Cir. 2006) . . . . . . . . 14, 46, 47, 49

*United States v. Rodriguez-Moreno,*
  526 U.S. 275 (1999). . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States v. Rommy,*
  506 F.3d 108 (2d Cir. 2007) . . . . . . . . . . . . . . . . 42

*United States v. Rosa,*
  17 F.3d 1531 (2d Cir. 1994) . . . . . . . 42, 43, 44, 45

*United States v. Royer,*
  549 F.3d 886 (2d Cir. 2008) . . . . . . . . . . . . . . . . 50

viii

PAGE

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) . . . . . . .   14, 46, 47, 48

*United States v. Saavedra,*
    223 F.3d 85 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 41

*United States v. Stavroulakis,*
    952 F.2d 686 (2d Cir. 1992) . . . . . . . . . . . . . . . . 37

*United States v. Stephenson,*
    895 F.2d 867 (2d Cir. 1990) . . . . . . . . . . . . . . . . 54

*United States v. Teman,*
    No. 21-1920, 2023 WL 3882974
    (2d Cir. June 8, 2023) . . . . . . . . . . . . . . . . . . 48, 56

*United States v. Thompson,*
    604 U.S. 408 (2025). . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Tuzman,*
    No. 21-2229, 2024 WL 1173044
    (2d Cir. Mar. 19, 2024) . . . . . . . . . . . . . . . . . . . . 47

*United States v. Weaver,*
    860 F.3d 90 (2d Cir. 2017) . . . . . . . .   26, 27, 33, 48

*United States v. Woods,*
    335 F.3d 993 (9th Cir. 2003) . . . . . . . . . . . . . . . . 37

*Universal Health Servs. v. United States,*
    579 U.S. 176 (2016). . . . . . . . . . . . . . . . . . . . . 30, 33

*Williams v. United States,*
    458 U.S. 279 (1982). . . . . . . . . . . . . . . . . . . . . . . 39

ix

PAGE

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3237(a) . . . . . . . . . . . . . . . . . . . . . . . . 42, 51

18 U.S.C. § 3731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §§ 2252A(a)(5)(B) . . . . . . . . . . . . . . . . . . . . . 3

7 U.S.C. § 13(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7 U.S.C. §§ 9(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . 3, 12, 15

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 C.F.R. § 180.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 25-1782

---

UNITED STATES OF AMERICA,

*Appellant,*

—v.—

AVRAHAM EISENBERG,

*Defendant-Appellee.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Jurisdictional Statement

The United States of America appeals from an order, entered on May 23, 2025, in the United States District Court for the Southern District of New York by the Honorable Arun Subramanian, United States District Judge, vacating a guilty verdict reached by a jury following a two-week trial on three counts, and ordering a judgment of acquittal on one of those counts.

After being granted a 30-day extension of the time to appeal, the Government timely filed a notice of appeal on July 22, 2025. The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 3731. The Solicitor General has authorized the prosecution of this appeal.

2

## Statement of Issues Presented for Review

1. Whether a rational jury could have found that defendant Avraham Eisenberg was guilty of wire fraud, where the evidence demonstrated that Eisenberg misrepresented his intention to "borrow" cryptocurrency, sent misleading information about the value of the assets he was using as collateral to "borrow," and executed a scheme to trick a cryptocurrency trading platform called Mango Markets into allowing him to obtain and steal cryptocurrency.

2. Whether a rational jury could have found that venue for wire fraud was proper in the Southern District of New York, where the evidence demonstrated that Eisenberg caused interstate wires to travel into the district in furtherance of the scheme to defraud.

3. Whether a rational jury could have found that venue for commodities fraud and manipulation was proper, where the evidence demonstrated that Eisenberg executed his fraudulent scheme using a cryptocurrency exchange operating in Manhattan.

## Statement of the Case

### A.   Procedural History

Indictment 23 Cr. 10 (AS) (the "Indictment") was filed on January 9, 2023, charging Eisenberg in three counts. Count One charged Eisenberg with commodities fraud, in violation of 7 U.S.C. §§ 9(1) and 13(a)(5), 17 C.F.R. § 180.1, and 18 U.S.C. § 2. Count Two charged Eisenberg with commodities manipulation, in violation of 7 U.S.C. § 13(a)(2) and 18 U.S.C. § 2. And

3

Count Three charged Eisenberg with wire fraud, in violation of 18 U.S.C. § 1343.

Before trial on the Indictment, Eisenberg pled guilty to Information 24 Cr. 251 (AS) (the "Information"), charging him with one count of possessing child sexual abuse material, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). On May 1, 2025, Judge Subramanian sentenced Eisenberg to a term of 52 months' imprisonment for Eisenberg's conviction on the Information.

Trial on the Indictment commenced on April 8, 2024 and ended on April 18, 2024, when the jury found Eisenberg guilty on all three Counts. Eisenberg moved for a judgment of acquittal on all Counts, pursuant to Federal Rule of Criminal Procedure 29, or in the alternative for a new trial on all Counts, pursuant to Federal Rule of Criminal Procedure 33.

In an order entered on May 23, 2025, Judge Subramanian granted Eisenberg's motion. As to the commodities fraud and manipulation charges, Judge Subramanian found that the evidence was sufficient to prove that Eisenberg committed these crimes, but insufficient to support venue in the Southern District of New York, and accordingly vacated Eisenberg's convictions on these Counts. As to the wire-fraud charge, Judge Subramanian found that the evidence was insufficient to prove Eisenberg committed this crime and insufficient to support venue, and accordingly entered a judgment of acquittal on this Count.

The Government timely filed a notice of appeal.

4

## B. Statement of Facts

### 1. The Government's Case

The evidence at trial established that Eisenberg perpetrated a fraudulent scheme to steal over $100 million of cryptocurrency from the users of a trading platform called Mango Markets. Mango Markets allowed users to borrow cryptocurrency from other users through loans collateralized by the value of the borrower's assets. Eisenberg defrauded Mango Markets by manipulatively pumping up the value of his assets; using the manipulated value of those assets as collateral to borrow huge sums of cryptocurrency from other users, despite having no intention to repay the loan, pay interest, or maintain required collateral levels; and then absconded with the borrowed funds. The Government's evidence included the testimony of 12 witnesses, as well as documentary evidence showing how Eisenberg planned, committed, and tried to evade being held liable for his criminal scheme.

#### a. Mango Markets and the MNGO Token

Mango Markets was a cryptocurrency exchange run by an entity called the Mango Decentralized Autonomous Organization (the "Mango DAO"). (A-700). The Mango DAO had its own cryptocurrency token, called MNGO, that investors could buy and sell. Ownership of MNGO was in certain ways analogous to ownership of stock, in that the owners of MNGO voted on various operational decisions, while a "group of developers was responsible for creating and maintaining

5

Mango Markets." (A-38-39, 218-19).[1] Mango Markets ran on a "smart contract," which was computer code that controlled how Mango Markets operated. (A-146-47). The Mango DAO and its development team could make changes to that smart contract, much like ordinary companies can update their websites. (A-76, 146-47).

To trade on Mango Markets, a user would set up an account. After depositing cryptocurrency into the account, the user could trade cryptocurrencies, invest in cryptocurrency-related financial products, lend cryptocurrency, and borrow cryptocurrency using the user's assets on Mango Markets as collateral. (A-707-09).

### b. Cryptocurrency Trading and MNGO Perpetuals

Eisenberg's fraudulent scheme revolved around two types of cryptocurrency trades. In one type of trade —known as a "spot" trade—an investor trades one type of cryptocurrency for another, at a particular exchange rate. An investor might, for instance, trade 0.05 Bitcoin for one Ethereum token, which would be expressed as an exchange rate of 0.05 BTC/ETH. The exchange rate depends on the supply and demand conditions for those two cryptocurrencies, at a particular time, on a particular exchange. (A-149-51).

---

[1] "A" and "SPA" refer to the appendix and special appendix filed with the Government's brief. Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

6

Eisenberg's scheme also involved trading perpetual futures contracts, commonly known as "perpetuals." When an investor buys or sells perpetuals, the investor does not trade cryptocurrency. Instead, the investor buys or sells a contract that gives exposure to the change in relative value of two cryptocurrencies. For example, one perpetual available on Mango Markets (the "MNGO Perpetual") was based on the relative value of MNGO and another cryptocurrency called USDC, which is a "stablecoin" designed to track the value of a dollar. If two investors on Mango Market traded a MNGO Perpetual, the party that bought the MNGO Perpetual would have the "long" position, which would increase in value if the value of MNGO rose relative to USDC. The party that sold the MNGO Perpetual would have the "short" position, which would increase if the value of MNGO fell relative to USDC.[2] (A-168-186, 200-06).

Either party to a MNGO Perpetual could "settle" at any time to realize their gains or losses. When a MNGO Perpetual settled, Mango Markets set the settlement price based on the exchange rate between MNGO and USDC ("MNGO/USDC"). Cryptocurrency exchange rates can differ across exchanges, so Mango Markets set the settlement price by using an "oracle," which is a program that calculates the relative value of two cryptocurrencies by looking at exchange rates on several platforms. (A-179-81). For MNGO Perpetuals, the oracle calculated the MNGO/USDC rate by

---

[2] Parties to a MNGO Perpetual also make regular "funding" payments. (A-182-87).

7

looking at three cryptocurrency exchanges: AscendEx, FTX, and Serum. (A-341).

### c. Borrowing and Lending

Eisenberg's fraudulent scheme also involved borrowing on Mango Markets. Mango Markets allowed users to borrow and lend cryptocurrency. (A-191-200, 727). Mango Markets advertised this as a way for users to "take out fully collateralized loans against existing assets." (A-670, 708-10). Before a user could borrow cryptocurrency, he had to have assets on the platform as collateral. (A-727). The borrower could then select the amount he wanted to borrow, which was limited by the value of those assets, as well as any other outstanding loans. (A-709-10, 727-30). The loan the borrower received came from the deposits of other Mango Markets users. After borrowing, the borrower was required to maintain sufficient collateral on Mango Markets and pay interest, until paying back the loan. (A-709-10, 727, 762). If the borrower failed to maintain sufficient assets to collateralize the loan, and pay interest, before paying off the loan, Mango Markets liquidated the borrower's assets to pay down debt. (A-709-10, 744-46).

### d. Eisenberg's Criminal Scheme

On October 11, 2022, Eisenberg orchestrated a fraudulent scheme to steal cryptocurrency from users of Mango Markets. He did so by creating two Mango Markets accounts and trading between them to create offsetting long and short positions on the MNGO Perpetual; manipulating the MNGO/USDC rate on multiple exchanges; then borrowing against the value of his

8

manipulated assets, while planning to run off with the cryptocurrency, rather than maintaining required collateral amounts, paying interest, or repaying the loan.

Eisenberg initiated the scheme by using deceptive means to access and fund trading accounts on two cryptocurrency exchanges: AscendEx and FTX. For AscendEx, Eisenberg created an anonymous account using a tool that made it appear to AscendEx that he was in Poland, even though he was located in Puerto Rico. (A-94-95, 627, 851). He then transferred approximately 110,000 USDT—like USDC, a stablecoin designed to track the value of a dollar—to his account. (A-93-94, 393-94, 844). That same day, Eisenberg logged into an account on FTX, using an account under the name of a Polish woman, which he had purchased several days earlier. Eisenberg transferred approximately 12.5 million USDC to that FTX account. (A-379-89, 844).

After funding those two accounts, Eisenberg opened two accounts on Mango Markets and funded each with approximately 5 million USDC. (A-844). He then had those two Mango Markets accounts trade over 4 million MNGO Perpetual contracts with one another. This left one account with a massive "long" MNGO Perpetual position, which would rise in value if the MNGO/USDC rate went up (the "Long Account"). The other account was left with an equally massive "short" MNGO Perpetual position, which would rise in value if the MNGO/USDC rate fell (the "Short Account"). (A-390-401, 845).

Eisenberg then began manipulating the oracle that set the settlement price for MNGO Perpetuals on

9

Mango Markets (the "Oracle"). AscendEx, FTX, and the company that ran the Oracle—called Switchboard —all had terms of service that prohibited manipulation and other abusive trading practices. (A-656-67, 795-96, 860). Notwithstanding those restrictions, Eisenberg went onto AscendEx, FTX, and another exchange called Serum and used USDC to buy over 20 million MNGO in the span of less than 20 minutes. His manipulative purchasing pumped up the MNGO/ USDC rate on all three exchanges, causing the relative value of MNGO and USDC—as reported by the Oracle —to spike, rising by over 1,000% in minutes. That, in turn, caused the value of the long MNGO Perpetuals in Eisenberg's Long Account to skyrocket. (A-401-06, 846).

As soon as the MNGO/USDC rate spiked, Eisenberg used the manipulated value of his Long Account to borrow tens of millions of dollars' worth of cryptocurrency on Mango Markets. The amount he could borrow was based on the value of the long MNGO Perpetuals, meaning that his manipulative trading dramatically increased the borrowing power of his Long Account. Taking advantage of that, Eisenberg went to Mango Markets and selected the option to "Borrow Funds." (A-727-30). He then borrowed tens of millions of dollars' worth of cryptocurrency, which came from other Mango Markets users. (A-410-13, 847).

Immediately after borrowing that cryptocurrency, Eisenberg switched from buying MNGO to selling MNGO on AscendEx, FTX, and Serum. He dumped over 20 million MNGO in the span of around 20 minutes, driving down the same MNGO/USDC rate

10

that he had just inflated. The rate dropped all the way back down to below where it had been at the time Eisenberg had first begun purchasing MNGO less than an hour earlier. (A-415-16, 848). As a result of this second round of manipulation, the value of the short MNGO Perpetuals in Eisenberg's Short Account increased in value. Eisenberg used that increase in value to "borrow" through the Short Account, borrowing all the remaining cryptocurrency in other Mango Markets users' accounts. (A-422-24, 849).

Although Eisenberg selected the option to "borrow" cryptocurrency, he had no intention to comply with the obligations that came along with borrowing—namely, paying interest and maintaining required collateral levels, until repaying the loans. Instead, he rapidly withdrew the cryptocurrency he borrowed. (A-850). This meant that, when the Mango Markets system kicked in to liquidate his account to repay his debts, there was nothing of value left. In all, Eisenberg made off with over $100 million worth of cryptocurrency that he borrowed from other Mango Markets users, leaving no cryptocurrency on the platform. (A-692-93). The team running Mango Markets disabled the platform shortly thereafter. (A-37, 305-06).

### e. Eisenberg's Knowledge of Wrongdoing

Eisenberg knew he was committing a crime. In the weeks leading up to his scheme, he posted on social media about fraud and market-manipulation cases; researched fraud and market-manipulation cases; and exchanged messages with a friend about a plan to do a

11

"pump" and "dump" scheme on Mango Markets that he could use to "pull borrows" off the platform. (*See, e.g.*, A-587-88, 616-22, 871, 633-49).

During the scheme, Eisenberg took steps to conceal his identity, including using someone else's identity to open an account on FTX and concealing his location information from AscendEx. (A-94-95, 378-80).

After executing the scheme, Eisenberg continued trying to protect himself from prosecution by extorting the Mango DAO. Eisenberg offered to return a portion of the cryptocurrency he stole, writing he would "Repay Bad Debt" if the Mango DAO used its treasury to cover the remainder of losses and agreed not to pursue civil claims or criminal investigations related to Eisenberg's scheme. (A-697).

While he was negotiating this proposal, there was speculation on the internet identifying Eisenberg as the perpetrator of the manipulative scheme. (A-873). Eisenberg reacted by fleeing from Puerto Rico to Israel. (A-563-66, 626). Negotiations continued after he made it abroad, and the Mango DAO ultimately acceded to Eisenberg's demands that, in exchange for the return of approximately $60 million worth of cryptocurrency, members of the Mango DAO would not pursue civil claims or a criminal investigation. (A-684). The result was that the Mango DAO incurred losses of approximately $40 million to cover the losses to Mango Markets users for the cryptocurrency Eisenberg did not return.

Eisenberg stayed abroad until he felt that things had "blow[n] over" (A-565-66), then returned to the

12

United States on December 26, 2022. (A-868). He was arrested upon arrival.

### 2. The Defense Case and Verdict

Eisenberg presented his defense by cross-examining witnesses and offering the testimony of an expert witness. The defense argued, among other things, that Eisenberg did not commit fraud or market manipulation because the Mango Markets smart contract did not prevent or prohibit him from the trading and borrowing he used to execute his scheme.

On April 18, 2024, the jury convicted Eisenberg on all three Counts in the Indictment.

### 3. The Sentencing and the District Court's Post-Trial Order

At the close of the Government's case-in-chief, Eisenberg moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Judge Subramanian reserved decision. After trial, Eisenberg filed a brief supporting his Rule 29 motion and, in the alternative, seeking a new trial under Rule 33.

While that motion was pending, on May 1, 2025, Judge Subramanian sentenced Eisenberg to a term of 52 months' imprisonment for Eisenberg's conviction for possessing child sexual abuse material that had been found on his electronic devices when he returned to the United States.

In an Opinion and Order dated May 23, 2025, Judge Subramanian entered a judgment of acquittal on the wire-fraud conviction under Count Three;

13

vacated all three Counts of conviction for lack of venue; and rejected Eisenberg's remaining arguments for acquittal or a new trial. (SPA-1). With respect to the wire-fraud conviction, Judge Subramanian concluded that "there was insufficient evidence of falsity." (SPA-28). As for venue, Judge Subramanian held that the Government failed to prove, by a preponderance of the evidence, that "essential conduct" for any of the offenses of conviction occurred in the Southern District of New York. (SPA-5-13, 26-28). Accordingly, while Eisenberg is serving a sentence for his conviction on the Information, he has not been held accountable for his scheme on Mango Markets, and members of the Mango DAO still have losses worth approximately $40 million.

## Summary of Argument

The jury convicted Eisenberg of wire fraud based on overwhelming evidence that he perpetrated a scheme to defraud. In overturning that verdict for insufficient evidence of "falsity," the District Court failed to hold Eisenberg to the heavy burden that applies to a defendant challenging the sufficiency of the evidence. Instead, it strained to construe the evidence in a manner that supported Eisenberg's motion—undervaluing and overlooking trial evidence that Eisenberg committed fraud by misrepresenting his intentions to "borrow" cryptocurrency and inflating his borrowing ability by submitting misleading information about the value of his assets.

Separately, the District Court committed legal error in assuming that a false statement of fact is a

14

required element of wire fraud. It failed to recognize that deceptive conduct can constitute a scheme to defraud, even when "no misrepresentation of fact is made." *United States v. Hild*, 147 F.4th 103, 111 (2d Cir. 2025). Eisenberg's scheme, as a whole, was deceptive because he tricked Mango Markets into giving him access to over $100 million of cryptocurrency, which Eisenberg stole. Thus, this Court should reverse the District Court for two independent reasons. First, the evidence was more than sufficient for a jury to conclude that Eisenberg made fraudulent misrepresentations. Second, the District Court erred in treating a false statement as a legal requirement and failing to consider the overall evidence that Eisenberg engaged in a deceptive scheme.

The District Court also erred in its venue analysis. With respect to the wire fraud charge, it failed to apply binding precedent that "venue lies where a wire in furtherance of a scheme begins its course, continues, or ends." *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015). Instead, the District Court erroneously imposed a requirement that the wire must be "essential" to the scheme to defraud, which is irreconcilable with Circuit decisions holding that in a wire-fraud prosecution, the wire "need not be an essential element of the scheme." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006). As for the commodities fraud and manipulation charges, the District Court failed to apply the Rule 29 standard. The jury verdict was based on the entirely reasonable inference that Eisenberg's manipulative trading, which used a cryptocurrency exchange operating in Manhattan, was a core part of his scheme.

15

## ARGUMENT

### POINT I

### The District Court Erred in Overturning the Jury's Conclusion that Eisenberg Committed Wire Fraud

The evidence was more than sufficient to support the jury's conclusion that Eisenberg committed wire fraud. The evidence overwhelmingly established that Eisenberg made fraudulent misrepresentations to perpetrate the scheme: he misrepresented his intention to "borrow" cryptocurrency, and he sent Mango Markets misleading information about the value of his assets. Moreover, even apart from whether Eisenberg's statements were technically false, the evidence plainly established that he engaged in a "deceit[ful]" scheme to obtain property. *United States v. Moses*, 109 F.4th 107, 117 (2d Cir. 2024). His scheme, as a whole, tricked Mango Markets into giving him cryptocurrency belonging to other users, which Eisenberg secretly planned to steal. Judge Subramanian's decision to overturn the jury's verdict was erroneous because he ignored critical evidence, relied on inferences the jury reasonably rejected, and committed legal errors that impermissibly narrowed the wire-fraud statute.

### A. Applicable Law

This Court "review[s] *de novo* a . . . grant of a Rule 29 motion, applying the same standard of sufficiency as the district court." *United States v. Coté*, 544 F.3d 88, 98 (2d Cir. 2008). "That standard imposes a heavy burden on the defendant, whose conviction must be affirmed if *any* rational trier of fact could have found the

16

essential elements of the crime beyond a reasonable doubt." *Id.* This requires "view[ing] the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018); *accord United States v. Cuti*, 720 F.3d 453, 462 (2d Cir. 2013). "[This Court] consider[s] the evidence in its totality, not in isolation, and the government need not negate every possible theory of innocence." *Coté*, 544 F.3d at 98.

## B. The Evidence Was Sufficient to Find that Eisenberg Falsely Represented His Intention to "Borrow."

One basis for concluding that Eisenberg's scheme was fraudulent was that he misrepresented his intention to "borrow" cryptocurrency. Clicking "borrow" conveyed that Eisenberg intended to maintain sufficient collateral on Mango Markets and pay interest, until he repaid the loans. That representation was false because Eisenberg intended to steal the cryptocurrency he obtained.

### 1. Relevant Facts

Mango Markets was a platform for collateralized borrowing and lending cryptocurrency. The homepage promoted the ability to "[e]arn interest on deposits and take out fully collateralized loans." (A-670, 679). And the "Welcome to Mango" popup advertised "[b]orrow[ing] against your assets." (A-698).

17

A Mango Markets user guide defined what borrowing entailed. (A-54, 700). The user guide explained that, before users could borrow on Mango Markets, there must be assets "deposited in [their] margin account[s] for use as collateral." (A-727; *see* A-190-91). Users would initiate the borrowing process by selecting an option to "Borrow Funds." (A-728-30; *see* A-191-98). Mango Markets would prompt users to select the amount of cryptocurrency they wanted to borrow, which was limited by the amount of collateral in the users' accounts. (A-191-98, 728-30). After a borrower entered the desired loan amount, Mango Markets ran an "Account Health Check" to ensure that the user had sufficient collateral, then issued the loan if—and only if—there was enough collateral in the account. (A-728-30; *see* A-191-98).

Upon receiving a loan, borrowers had to pay interest and maintain sufficient collateral, until repaying. Mango Markets deducted interest automatically from borrowers' accounts. (A-191-200, 730). That meant that borrowers needed to monitor to make sure they kept enough collateral on Mango Markets to secure the loan. (A-198-200, 709-10). Mango Markets calculated whether an account had sufficient collateral using a formula called a "Health Ratio," which was based on the value of a borrower's assets and the amount of outstanding loans. (A-709-10, 744-45; *see* A-198-200). Mango Markets did not impose a repayment deadline for loans, but the obligation to maintain collateral and pay interest lasted until the borrower repaid the debt. (A-709-10, 730). Borrowers who failed to maintain sufficient collateral to pay interest until repaying their loans faced a consequence: liquidation. Mango

18

Markets would automatically sell the borrower's assets to pay down debt. (A-709-10, 744-46; *see* A-198-200, 244-45).

Consistent with the user guide, witnesses testified that borrowing on Mango Markets entailed an obligation to pay interest and maintain sufficient collateral on the platform, until repaying the loan. One of the original employees of Mango Markets testified that someone who borrows must pay interest and is "expected to keep the collateral value [of their account] positive." (A-46-49). An expert witness explained that "borrowing . . . entails" maintaining enough "collateral to keep [the borrower's] account in a positive balance" and to "pay interest" until "repay[ing] the principal." (A-191-200, 244). And three witnesses testified that it would have mattered if someone tried to borrow without intending to maintain sufficient collateral because that could inflict losses on Mango Markets users. (A-49-50, 270, 499).

Eisenberg understood what borrowing meant from researching the Mango Markets user guide before his crime, including the portions about borrowing and the Health Ratio. (A-582-592). But Eisenberg had no intention to do what borrowing required—namely, to pay interest and maintain collateral, until repaying his loans. Instead, he immediately removed from Mango Markets the cryptocurrency he borrowed, leaving nothing in his accounts to secure his loans. (A-846-49). Recognizing that he had abused the borrowing process, when Eisenberg offered to negotiate the return of some funds in exchange for protection from criminal investigations, Eisenberg described the losses with which

19

he had saddled Mango Markets users as "bad debt." (A-697).

### 2. Discussion

The evidence was sufficient for a reasonable jury to conclude that Eisenberg's scheme was fraudulent because he misrepresented his intention to "borrow" cryptocurrency, when he intended to steal it. The wire-fraud statute criminalizes any plan to obtain money or property through a "scheme or artifice to defraud" or "by false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. This encompasses schemes to defraud through "suggestions and promises as to the future." *Durland v. United States*, 161 U.S. 306, 313 (1896); *accord McNally v. United States*, 483 U.S. 350, 357-58 (1987) (holding that wire fraud "reaches everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future").

Eisenberg made a misleading suggestion or promise about his intentions when he clicked "borrow." Mango Markets set out the terms of borrowing through its user guide. Those terms included that borrowers must pay interest and maintain sufficient collateral, based on the Health Ratio formula. The user guide further said that the obligation to pay interest and maintain collateral would continue until the borrower repaid the loan. Mango Markets also designed computer code—its smart contract—to enforce the terms of borrowing by restricting the size of loans based on the value of the borrower's collateral, automatically calculating and withdrawing interest from

20

the borrower's account, and liquidating the borrower's assets if the borrower ran afoul of the collateral requirements. (A-191-200, 709-10, 727-30, 744-46).

When Eisenberg clicked "borrow," he conveyed his intention to comply with the terms Mango Market set out for borrowing—namely, to pay interest and maintain sufficient collateral, until repaying his loans. That representation was false. Eisenberg had no intention to pay interest and maintain required collateral until repaying; he planned to abscond with the cryptocurrency, leaving Mango Markets with collateral that he knew was worthless. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) ("Failure to comply with a contractual obligation is . . . fraudulent when the promisor *never intended* to honor the contract."); *United States v. Amrep Corp.*, 560 F.2d 539, 543-44 (2d Cir. 1977) ("Declarations of opinion as to future events which the declarant does not in fact hold may be . . . fraudulent."); *Kousisis v. United States*, 605 U.S. 114, 125 (2025) (affirming conviction when defendant "tricked [victim] into a bargain materially different from the one they had promised"). On these facts, the jury was on firm ground to conclude that he committed fraud.

Judge Subramanian erred in overturning this verdict. He ignored inconvenient evidence, relied on inferences the jury was entitled to reject, and imposed legal barriers to finding fraud that have no basis in the law.

The District Court refused to view the record in the light most favorable to the jury's verdict. Judge Subramanian concluded that Eisenberg, in clicking "borrow," did not express an intention akin to a promise to

21

"honor one's obligations under a contract" because "[t]here was no evidence that the 'borrow' function on Mango Markets entailed an obligation to repay—or any other obligation." (SPA-30-31). That is at odds with the evidence. To begin, the plain meaning of the word "borrow" itself conveys an intent to repay, typically with interest. To "borrow" is to "take something for temporary use," or to "receive money with the understanding or agreement that it must be repaid, usu[ally] with interest." *Black's Law Dictionary* (12 ed. 2024); *accord Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/borrow (defining "borrow" as "to borrow (money) with the intention of returning the same plus interest"). The jury could have reasonably found based on the commonly accepted meaning of this term that Eisenberg made a misleading statement by agreeing to "borrow."

And the proof at trial went far beyond the word "borrow." The Mango Markets user guide defined what borrowing entailed, including stating that borrowers must pay interest and "must maintain a Health Ratio above 0%" until repaying the loan. (A-709-10; *see* A-200, 534). Mango Markets set up a system to enforce those terms through its smart contract. (A-48-49, 200, 244-45, 727-30, 744-46). And multiple witnesses testified that "borrowing . . . without intending to maintain collateral" was inconsistent with their understanding of what borrowing was. (A-49-50; *see* A-270, 499). Far from "no evidence" that borrowing "entailed an[y] obligation," (SPA-31), this was a firm basis on which the jury could conclude that, when Eisenberg clicked "borrow" despite lacking any plans to pay interest and

22

maintain collateral until repaying his loan, he misrepresented his intentions.

In resisting this conclusion, the District Court drew inferences that were inconsistent with the evidence—and certainly not inferences that the jury was required to make—in an effort to distinguish borrowing on Mango Markets from his view of the "conventional understanding" of what borrowing means. (SPA-31). For instance, Judge Subramanian asserted that there was no contractual "obligation to repay," but made no mention of the obligations to pay interest and maintain collateral. (*Id.*). It was wrong to consider a "repayment" obligation in isolation from those other obligations. *See United States v. Jabar*, 19 F.4th 66, 79 (2d Cir. 2021) (reversing judgment of acquittal where District Court failed to accept jury's reasonable conclusion about the scope of contractual obligations). They worked as a package. True, there was no specific repayment deadline on Mango Markets. But borrowers had the obligation to pay interest and maintain sufficient collateral until repaying the loan. Indeed, far from being unconventional, an expert witness testified that Mango Markets loans resembled a "margin loan" in traditional finance, which also has no repayment date but remains "outstanding" as long as the borrower pays interest and maintains sufficient collateral. (A-191-92; *see* A-727 (referring to borrower's account as a "margin account")).

It was similarly erroneous for the District Court to conclude that, because borrowers who failed to maintain sufficient collateral would "be liquidated," there were no obligations. (SPA-30-31). That has things

23

backwards. Liquidation is the *consequence* for failing to comply with the *obligation* to maintain enough collateral until repaying the loan. (A-48, 200, 244-46, 534). There is nothing unconventional about this. In a non-recourse loan, for example, if a borrower defaults, the lender may foreclose on the borrower's collateral, but "recovery is limited to the value of the collateral pledged as security." *Bridge Fin. Pty. v. RPE I Investor I, LLC*, 23 Civ. 11230 (JSR), 2024 WL 1806414, \*3 (S.D.N.Y. Apr. 25, 2024). This does not mean that a borrower in a non-recourse loan has no obligations, just that the contractual remedy is capped by the value of the borrower's collateral. The jury reasonably could have reached the same conclusion here: Eisenberg had an obligation to maintain collateral until repaying his loan, and liquidation was the remedy on Mango Markets for a borrower's failure to fulfill that obligation.

In yet another factual misstep, Judge Subramanian relied heavily on the lack of a written loan agreement or formal negotiations when borrowing on Mango Markets. (SPA-30-31.) As explained below, that reasoning was based on an incorrect legal premise that a contractual promise is necessary for fraud. But it was also factually wrong to overturn the jury's verdict due to the lack of negotiations or a written contract. Such formalities are not necessary to form a contract. *See* Rest. (Second) Contracts §§ 4-6 (explaining that assent to, and the terms of, a contract can be "expressed in the language of the parties or implied in fact from other conduct"); *accord Liebowitz v. Cornell University*, 584 F.3d 487, 506-07 (2d Cir. 2009). Here, the jury reasonably could have found that Mango Markets made an offer by giving users the opportunity to

24

borrow, describing the terms of borrowing in the user guide, and implementing them in its smart contract. And the jury could have found that Eisenberg expressed his intention to abide by those terms by clicking "borrow." *See* Rest (Second) Contracts §§ 30, 32, 50. Judge Subramanian was wrong to require more formalities.

These factual errors culminated in the District Court's startling assertion that the actual words used were irrelevant to the question of whether they were false. (SPA-31 (asserting that Mango Markets and Eisenberg might instead have chosen to use words other than "borrow")). The jury was not required to take such a dismissive view of the evidence. The "borrow" button on Mango Markets was not labeled arbitrarily. The platform was advertised as a site to take out "fully collateralized loans." (A-670). The user guide explained the requirements for taking out a collateralized loan. (A-727-30). Consistent with that user guide, the computer code on Mango Markets withdrew interest and monitored collateral levels, until the loan was paid off. (A-709-10, 727-30, 744-46). And Eisenberg himself used the language of loans when describing his scheme, writing after the fact about his proposal to "Repay Bad Debt." (A-697). It was reasonable for the jury to conclude that, if it was labeled as a loan, it was described as a loan, and everyone (including the defendant) talked about it like it was a loan, then it was a loan. Rule 29 did not authorize Judge Subramanian to overturn that judgment.

Indeed, the District Court's stilted view of the facts in this case would unsettle traditional understandings

25

of fraud. Suppose a fraudster emailed a victim and said: "I need to borrow $10,000. You can take my watch as collateral. I just bought it for $15,000, and you can sell it if I don't pay you back." The victim sent the money, not knowing that the fraudster had no intention to repay the loan and had only paid $15,000 for the watch because he sold it to a friend for $15,000 then immediately bought it back at the same price. The fraudster's claim to be "borrowing" in this scenario is misleading. Yet under the District Court's view, fraud would be legally impossible because there is no written loan agreement, no negotiation, no repayment deadline, and an agreed-upon liquidation remedy.

What is more, the District Court made two other legal errors, inventing new limitations on the wire-fraud statute. For one, the District Court erred in concluding that, for Eisenberg's borrowing to be fraudulent, he needed to make a "contractual promise" similar to the one in *Countrywide*. (SPA-30-31). As noted above, Eisenberg did make a contractual promise when he borrowed on Mango Markets. But even if he did not, Eisenberg still committed fraud because wire fraud is not limited to misrepresentations through contractual promises, but instead "reaches everything designed to defraud by . . . suggestions and promises as to the future." *McNally*, 483 U.S. at 357-58. In *Countrywide*, the Court addressed what constitutes fraud when "alleged misrepresentations concerning future performance are contained within a contract." 822 F.3d at 658. But nothing in *Countrywide* suggests that a scheme to defraud can *only* be proven when the misrepresentations about future intentions are in a contract. This Court routinely upholds convictions when

26

defendants convince others to invest based on oral claims about plans for the future or expected profits, even when those promises are not in contracts. *See United States v. Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017). So even if borrowing on Mango Markets did not entail a contractual promise, that was not a basis to overturn the verdict. The jury still reasonably concluded that, by clicking "borrow," Eisenberg misleadingly conveyed that he intended to maintain collateral on the platform and pay interest, until repaying his loans.

Moreover, the District Court made a legal error in giving heavy weight to the fact that Mango Markets did not have written "terms of service" and had a disclaimer that people should "use [the platform] at [their] own risk." (Op. 30). There did not need to be terms of service prohibiting fraud for Eisenberg's scheme to have been fraudulent; most wire fraud cases do not involve terms of service. Similarly, contractual disclaimers "do not bear on [a] defendant's criminal liability." *Weaver*, 860 F.3d at 95. While the existence or nonexistence of such contractual language may be "relevant to the jury's determination," it cannot render otherwise fraudulent statements "immaterial as a matter of law." *Id.* at 97. It was legal error for the District Court to erect a rule that, because Mango Markets did not have terms of service and used a general disclaimer, it was legally impossible for Eisenberg representing that he was "borrow[ing]" to be misleading.

Judge Subramanian appears to have erected these requirements due to his sense that Eisenberg's case involved the "unconventional context of a cryptocurrency

27

platform running on an algorithm." (SPA-31). The jury, however, considered evidence showing why, in the context of Mango Markets, Eisenberg's scheme was fraudulent, and Rule 29 is not a basis to lessen anti-fraud protections simply because a (relatively) new industry is involved. The fact Mango Markets was "running on an algorithm," (*id.*), also did not support overturning the jury's verdict. The algorithm was just computer code, which was not meaningfully different from software programs that people use every day across all facets of the modern economy, such as automated computer programs used by banks to approve loan applications, (A-240-42), or traditional brokerage firms that use computer programs to approve transactions, (A-527-29). And just like the programs used by other entities, the Mango Markets algorithm was controlled by humans who could change or pause the platform—as they did in response to Eisenberg's scheme. (A-38-39, 73-76). On these facts, the jury correctly concluded that Eisenberg's scheme was fraudulent notwithstanding the "unconventional context," and there was no basis under Rule 29 to overturn that verdict.

## C. The Evidence Was Sufficient to Find that Eisenberg Falsely Represented The Value of His Collateral.

Eisenberg's scheme was also fraudulent because he misrepresented the value of his collateral on Mango Markets. To increase his borrowing power, Eisenberg manipulated the price of MNGO Perpetuals, and then submitted his "borrow" request based on that false price. The jury could reasonably have concluded that using a manipulated price to obtain loans was fraud.

28

### 1. Relevant Facts

Before Eisenberg could borrow cryptocurrency on Mango Markets, he needed a seemingly valuable asset against which to borrow. He obtained that through market manipulation.

Eisenberg opened two accounts on Mango Markets, then traded with himself to create a large "long" MNGO Perpetual position in his Long Account and a large "short" MNGO Perpetual position in his Short Account. Mango Markets set the settlement price of MNGO Perpetuals using the Oracle, which was run by a company called Switchboard and used data from FTX, AscendEx, and Serum to determine the MNGO/USDC exchange rate. (A-341-43).

Mango Markets selected these sources because the platforms had "anti-manipulation protection" to help ensure prices reflected "organic demand." (A-344-46). For example, AscendEx had "rules . . . designed to prevent the use of AscendEx for disruptive or manipulative conduct or deceptive practices," such as "market manipulation." (A-860). FTX prohibited "market abuse," including "engaging in disorderly market conduct." (A-795-96). And Switchboard prohibited using its oracles in ways that would "deceive or defraud," such as by providing "inaccurate or misleading information." (A-656-57). These protections were important: witnesses who used and helped build Mango Markets explained that it would have mattered to them to know whether someone was "intentionally moving the price of perpetuals on Mango Market" because of the risk that manipulation posed to other users of the platform. (A-488-50; *see* A-52-54, 265-66).

29

Notwithstanding these prohibitions, Eisenberg used AscendEx, FTX, and Serum to manipulate the Oracle. He did so by logging onto those platforms—using misleading information on AscendEx and FTX in the process—then buying huge quantities of MNGO to drive up the price reported by the Oracle and, by extension, the settlement price of MNGO Perpetuals on Mango Markets. (A-844-850).

Eisenberg used that pumped-up price to borrow through his Long Account. (A-847). When Eisenberg hit "borrow," he sent information to Mango Markets about his manipulated asset value, which Mango Markets used to perform an "Account Health Check" before issuing a loan. (A-197-98, 728-30). If he had not manipulated the Oracle, the value of his assets would not have been high enough to take out huge loans, so sending the manipulated asset value was essential to his scheme. Once Eisenberg pulled his first set of loans off of Mango Markets, he drove the value of MNGO Perpetuals down by dumping MNGO and borrowed more through his Short Account. (A-848-49). Again, without his manipulative trading to control the price of MNGO Perpetuals, he could not have taken out the large loans that were central to his scheme.

### 2. Discussion

The jury reasonably concluded that using manipulated asset values to obtain loans was fraudulent. It is "unlawful [under the wire-fraud statute] to speak 'half truths' or to omit to state facts necessary to make [a] statement made, in light of the circumstances under which [it was] made, not misleading." *United States v.*

30

*Autuori*, 212 F.3d 105, 118 (2d Cir. 2008). Deciding whether a statement is misleading "under the circumstances" is a fact-intensive inquiry that turns on the relevant context. *United States v. Petrossi*, 786 F. App'x 286, 288-89 (2d Cir. 2019); *accord Universal Health Servs. v. United States*, 579 U.S. 176, 188-89 (2016).

Here, when Eisenberg borrowed on Mango Markets, he sent information to the platform showing that, according to the Oracle, his MNGO Perpetuals were extraordinarily valuable. That information allowed him to take out large loans. (A-197-98, 728-30). Sending it was "misleading in context" because the recipient of the information "would probably—but wrongly —conclude" that the value of Eisenberg's assets were not manipulated. *Universal Health*, 579 U.S. at 189; *see United States v. Pacilio*, 85 F.4th 450, 460-61 (7th Cir. 2023) (finding submission of order implied genuine intent to buy or sell).

The context made Eisenberg's representations misleading for two reasons: First, the Oracle that set the value of his MNGO Perpetuals drew from sources (such as AscendEx and FTX) that had anti-manipulation rules and was run by a company (Switchboard) that prohibited using the Oracle to mislead. (A-656-57, 795-96, 860). Because the inputs to the Oracle prohibited manipulation, Eisenberg's loan application to Mango Markets carried with it the suggestion that he had not manipulated the value of his assets. *See Universal Health*, 579 U.S. at 189-90 (holding that submission for reimbursement for medical services implied

31

that defendant had complied with relevant state medical rules).

Second, the value of Eisenberg's MNGO Perpetuals was based on the MNGO/USDC exchange rate, which is a form of price. Market participants rely on the belief that prices typically reflect the interplay of supply and demand for assets, not a bad actor artificially controlling prices. *See United States v. Phillips*, 155 F.4th 102, 130-31 (2d Cir. 2025). So even in the absence of the anti-manipulation rules on AscendEx, FTX, and Switchboard, Eisenberg's loan application deceptively took advantage of the common assumption that prices are not manipulated. *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (holding that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the marketplace and is an omission of a material fact").[3]

_____

[3] Judge Subramanian distinguished *Regan* on the grounds that it was a securities-fraud case. But that is beside the point. The Government did not argue that open-market manipulation (like what was at issue in *Regan*) constitutes wire fraud. Rather, the argument was that Eisenberg's submission of an asset value based on a manipulated price to Mango Markets was misleading because people do not expect prices to be manipulated, especially when relying on those prices to value collateral for a loan. *Regan* makes the common-sense point about what is implied by a market price, and the jury was allowed to use its common-sense understanding of context when assessing

32

Judge Subramanian, in rejecting this theory of fraud, made factual errors and misapplied this Court's decision in *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022). Factually, Judge Subramanian acknowledged the evidence that the Oracle drew on sources with anti-manipulation protections, and the testimony that the risk of manipulation would have mattered to Mango Markets developers and users, had they known about it. (SPA-31, 34-35). Yet he erroneously refused to "credit [the reasonable] inference" that, if the Oracle was based on inputs that prohibited manipulation, it would be misleading to knowingly use a manipulated Oracle price to obtain loans. *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008).

The only factual basis Judge Subramanian gave for rejecting that inference was the claim that there "was no evidence at trial that Mango Markets had any rules, instructions, or guidance addressing manipulation or requiring users to maintain sufficient collateral in their accounts." (SPA-33). But that reasoning was not a basis to overturn the verdict. As an initial matter, the District Court failed to recognize that Mango Markets *did* require users to have sufficient collateral: The entire purpose of the "Account Health Check" was to ensure there was sufficient collateral before issuing loans. (A-709-10; *see* A-200, 534).

But even if the District Court had been right on the facts, its legal reasoning was erroneous. It would be an

_____

whether submitting a manipulated price to obtain a loan is misleading.

33

odd rule of law to condition fraud liability on whether the victim had expressly sought assurances that it was not being misled. Not only is there no legal authority for such a counterintuitive rule, but as noted above, the law is directly contrary to the reasoning applied by the District Court. A person may be guilty of fraud even if the victim expressly *disclaims* reliance on past misrepresentations. *Weaver*, 860 F.3d at 95.

The District Court's insistence on rules or terms of service is legally unsupported because rules and terms of service are often not, "under the circumstances," necessary to make a statement misleading. *Petrossi*, 786 F. App'x at 288-89. For instance, a "seller who reveals there may be two roads near a new property he is selling, but fails to disclose a third," has told a misleading half-truth, even in the absence of contractual rules about disclosures. *Universal Health*, 579 U.S. at 189. Or consider the fraudster described earlier, who obtained a loan using a watch as collateral, saying he recently bought the watch for $15,000, without disclosing that his purchase had not been a normal transaction. The statement about the value of the watch was misleading, even without any rules about disclosures, because it deceptively took advantage of the common-sense meaning of a sale.

Eisenberg's fraud was much the same: He knew Mango Markets operated on the understanding that asset values submitted to obtain loans were not manipulated—both because the Oracle inputs prohibited manipulation and because people do not expect price manipulation—so the jury reasonably concluded that submitting a manipulated value was misleading,

34

regardless of any rules about manipulation on Mango Markets.

In reaching a different conclusion, the District Court relied on *Connolly*, but that decision did not hold that rules, or terms of service, are necessary to make a statement misleading. Instead, *Connolly* was a fact-bound decision about how the nature of a victim's question, in a specific context, rendered a statement made in response to that question not misleading. The jury in *Connolly* convicted two Deutsche Bank traders of participating in a wire-fraud scheme "in connection with the submission of statements that could affect the London Interbank Offered Rate ('LIBOR')." 24 F.4th at 823. Each day, the British Bankers' Association ("BBA") asked Deutsche Bank a "hypothetical" question about "the rate at which it could borrow funds." *Id.* at 835. The defendants influenced Deutsche Bank's answers to that question to benefit the defendants' trading positions. *Id.* at 828-29. The Government argued that this influence made Deutsche Bank's LIBOR submissions misleading—even if Deutsche Bank "could have borrowed funds at [the] submitted rate"— because the defendants did not disclose their influence. *Id.* at 830-32.

This Court rejected the Government's theory. Focusing on the "precise hypothetical question" asked by the BBA, the Court noted that the BBA's instructions "explicitly barr[ed] collaboration between panel banks, [but] said nothing to bar a panel bank's LIBOR submitters from receiving or considering input from that bank's employees." *Id.* at 834-35, 842. Because of this explicit ban on "int*er*bank input," when Deutsche

35

Bank made its LIBOR submission, there was no implicit representation that the submission was free from "int*ra*bank input." *Id.* at 842.

Judge Subramanian misapplied *Connolly* in deciding that it required overturning the jury's verdict here. As he saw it, Mango Markets did not have prohibitions on market manipulation, just like the BBA had no prohibition on intrabank influences, so the cases were a match. (SPA-32-33). But that similarity is purely superficial. The question in *Connolly* was whether submitting a rate to the BBA implied that the rate had not been influenced by traders at the bank. The BBA's instructions were critical to answering that question: in the abstract, there was no reason why submitting a rate implied an absence of intrabank influence. Because the BBA's rules not only lacked a prohibition on intrabank influence, but *did* have a prohibition on interbank collaboration, those rules undermined—rather than created—the suggestion that submitting a rate implied a lack of influence by traders at the same bank.

By contrast, Mango Markets did not need its own rules to create the expectation that the asset values were not manipulated. That expectation arose from the fact that it chose inputs to the Oracle that prohibited manipulation, as well as from the common-sense expectation (reinforced by anti-manipulation laws and the testimony of multiple witnesses about why it would have mattered to them to know if prices were being manipulated) that when a person offers collateral for a loan, he has not used market manipulation to falsely inflate the value of that collateral. Adding

36

terms of service that barred manipulation could have created a separate, contractual right to sue Eisenberg. But the jury was not required to find that such terms were necessary to make his loan submission misleading.

### D. The Evidence Was Sufficient to Conclude that Eisenberg Executed a Scheme to Defraud, Even If There Were No Misrepresentation.

Because the District Court erred in concluding that there was insufficient evidence of a false representation, it should be reversed. But even if the District Court were correct that Eisenberg's representations were not "technically" false, (SPA-32), the decision to overturn the jury's verdict was legally erroneous because it failed to recognize that deceptive conduct can amount to fraud, even when "no misrepresentation of fact is made." *Hild*, 147 F.4th at 111. Thus, even if Eisenberg's representation that he was borrowing and his submission of inflated asset values were not misrepresentations (although they were), his scheme as a whole was fraudulent because it tricked Mango Markets into giving him loans to which he was not entitled by giving a false impression about his collateral and intentions.

Judge Subramanian's decision was based on the premise that wire fraud requires proof of a false representation. (SPA-28). That is a misreading of the law. While misrepresentations are sufficient to establish fraud, the law extends to any "scheme to engage in some form of deception." *Connolly*, 24 F.4th at 833-34. That reach is clear from the text and history of the

37

statute. When first enacted, the mail-fraud statute (the predecessor to wire fraud) prohibited the use of the mails "in furtherance of 'any scheme to defraud.'" *McNally*, 483 U.S. at 356. The Supreme Court has long held that this was not limited to misrepresentations, but instead referred broadly "to wronging one in his property rights by dishonest methods or schemes," including by "trick, deceit, chicane, or overreaching." *Id.* at 358. Congress amended the statute in 1909 to add the clause prohibiting "obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* at 357. But that amendment was intended to reinforce the Supreme Court's decision in *Durland* that the statute reached "promises and misrepresentations as the future," not to restrict the reach of the preexisting "scheme to defraud" language. *Id.* at 359.

Consistent with this history, the Supreme Court and Courts of Appeals have held that statutes prohibiting schemes to defraud are not limited to those that involve misrepresentations, but instead reach "a broader range of deceptive conduct." *United States v. Kurleman*, 736 F.3d 439, 446 (6th Cir. 2013); *see, e.g.*, *Hild*, 147 F.4th at 111 ("[A] scheme exists although no misrepresentation of fact is made."); *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992) (holding "scheme to defraud" encompasses "a pattern or course of conduct"); *United States v. Colton*, 231 F.3d 890, 898 (4th Cir. 2000) (holding "scheme to defraud" includes "acts taken to . . . create a false impression"); *United States v. Clausen*, 792 F.2d 102, 104-05 (8th Cir. 1986) (holding "scheme to defraud" can occur "whether or not any specific misrepresentations are involved"); *United*

38

*States v. Woods*, 335 F.3d 993, 997-98 (9th Cir. 2003) ("A defendant's activities can be a scheme or artifice to defraud whether or not any specific misrepresentation are involved.").[4] This makes good sense. There is no logical distinction between a misrepresentation and misleading conduct—both create a misimpression. And when Congress wanted to limit a statute to "false statements," rather than schemes to defraud, it did so expressly. *See United States v. Thompson*, 604 U.S. 408, 413 (2025).

Cases involving check kiting illustrate the point. In a check-kiting scheme, a fraudster writes checks from an account that he knows lacks sufficient funds; deposits those checks into another bank account, knowing it

---

[4]  Although there are decisions where courts refer to mail and wire fraud as requiring proof of a material misrepresentation, those statements do not limit the scope of the statutes. Instead, they arise in cases where the alleged fraud revolved around misrepresentations and the court was focused on the materiality of those misrepresentations. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 22 (1999) (stating that "fraud require[s] a misrepresentation or concealment of a *material* fact" to clarify materiality element). Similarly, the District Court cited *United States v. Kitchen*, No. 99-1576, 2000 WL 553884, *2 (2d Cir. May 3, 2000), a pre-2008 summary order from this Court which, in the course of discussing whether a defendant's "numerous misrepresentations" were material, stated that "[e]stablishing a scheme to defraud requires proof of a material misrepresentation." (SPA-28).

39

will cause the bank to treat that account as if it had a higher value; and then withdraws funds from that account before the check bounces. In *Williams v. United States*, the Supreme Court held that check kiting did not involve a "false statement" in violation of 18 U.S.C. § 1014, reasoning that a check does not "make any representation as to the state of [the defendant's] bank balance." 458 U.S. 279, 284-85 (1982). Congress responded by enacting the bank-fraud statute, expressly "model[ling it] on the . . . wire and mail fraud statutes" to prohibit both any "scheme or artifice . . . to defraud" and any scheme to obtain money "by means of false or fraudulent pretenses, representations, or promises." *United States v. Bonnett*, 877 F.2d 1450, 1454 (10th Cir. 1989).

Courts interpreting that statute have consistently held that check kiting—despite not involving a false statement—is a "scheme or artifice . . . to defraud" because it "trick[s] the victim bank] into inflating bank balances and honoring checks drawn against accounts with insufficient funds." *United States v. Doherty*, 969 F.2d 425, 428-29 (7th Cir. 1992) (collecting cases); *accord United States v. Burnett*, 10 F.3d 74, 77-79 (2d Cir. 1993). And because the wire-fraud statutes use the same language, courts have also held that check kiting constitutes wire fraud, even in the absence of a misrepresentation. *See, e.g.*, *United States v. Rafsky*, 803 F.2d 105, 108-09 (3d Cir. 1986) (collecting cases). Similarly, courts have found that deceptive conduct can constitute a scheme to defraud under the wire-fraud statutes in other contexts, such as misappropriating confidential business information, *Carpenter v. United States*, 484 U.S. 19, 27 (1987), embezzling

40

funds, *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995), placing trades with the intent to cancel them, *Pacilio*, 85 F.4th at 460-61, and rolling back odometers before reselling cars, *Schmuck v. United States*, 489 U.S. 705, 714-15 (1989). And this Court has affirmed a wire-fraud conviction where the scheme participants used an algorithm to predict the behavior of slot machines, which involved no misrepresentation aside from the implicit understanding that casino-goers are not engaged in such conduct. *See United States v. Arslanouk*, 853 F. App'x 714, 720 (2d Cir. 2021).

Eisenberg's fraudulent scheme is analogous to check kiting (although as discussed above, Eisenberg also made misrepresentations). Eisenberg knew that, if he wanted to obtain large amounts of cryptocurrency, he needed to trick Mango Markets into issuing loans by making worthless collateral appear to be valuable. So like the check kiter fraudulently inflates the value of his bank account using bad checks, Eisenberg fraudulently inflated the value of his assets by manipulating the value of MNGO Perpetuals. This unlocked loans that Eisenberg knew his assets could never cover, just as bad checks allow a check kiter to take out money he knows the bank will never receive. In short, both check kiting and Eisenberg's crime involve a deceitful scheme to create a "false impression" about the value of an account, so the defendant can obtain property he would not otherwise have obtained. *In re Refco Capital Markets*, 6 Civ. 643 (GEL), 2007 WL 2694469, at *8 (S.D.N.Y. Sept. 13, 2007).

The jury was correct to conclude that Eisenberg committed a scheme to defraud, and Judge

41

Subramanian erred in failing to recognize the multiple reasonable grounds on which the jury could have convicted.

## POINT II

### The District Court Erred in Vacating the Jury's Verdict for Improper Venue

Judge Subramanian also erred in vacating the jury's verdict on the theory that venue was not proper in the Southern District of New York. His decision ignored binding precedent and departed from the requirements of Rule 29.

### A. Applicable Law

The Constitution and Rules of Criminal Procedure require that defendants be tried in the district in which the charged crime "shall have been committed." U.S. Const. art. III, § 2, cl. 3; *accord id.* amend. VI; Fed. R. Crim. P. 18. This requirement was adopted to protect defendants from "the unfairness and hardship" of prosecution "in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).

Where a defendant is charged with multiple crimes, the Government must prove venue with respect to each charge. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). Deciding whether the Government has established venue proceeds in two steps: First, the court must "identify the conduct constituting the offense," which requires a statutory analysis of the charged offense. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279-

42

80 (1999); *accord United States v. Saavedra*, 223 F.3d 85, 90 (2d Cir. 2000). Then, the jury must "discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279-80.

"[T]he [C]onstitution does not command a single exclusive venue," *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1984), so "where a crime consists of distinct parts which have different localities[,] the whole may be tried where any part can be proved to have been done," *Rodriguez-Moreno*, 526 U.S. at 281. Accordingly, Congress has codified the rule that, when a crime is "committed in more than one district," venue lies "in any district" in which an offense "was begun, continued, or completed." 18 U.S.C. § 3237(a).

"[T]he venue requirement, despite its constitutional pedigree, is not an element of a crime," so "venue need be proved only by a preponderance of the evidence." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). As with any challenge to the sufficiency of evidence, this Court "must view the evidence [of venue], both direct and circumstantial, in the light most favorable to the government and must credit every inference that could have been drawn in its favor." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994).

## B. Relevant Facts

Venue was proper in the Southern District of New York as to all counts because Eisenberg's scheme involved using AscendEx, which ran out of Manhattan, and because Eisenberg's market manipulation sent

43

misleading price information to, and harmed, a victim in the District.

According to AscendEx's general counsel, James Farrell, AscendEx was run largely out of Manhattan, by people who are legally employed by a company called HD Consulting. (A-80, 127-28). Those employees worked in "midtown Manhattan" and included "the co-founders of [AscendEx] as well as legal compliance, [human resources], about half of [AscendEx's] programmers, [the] entire finance team, and about half of [the] sales team." (A-80-82).

Because of these extensive operations in Manhattan, using AscendEx necessarily involved sending information to, and activity occurring in, the District. "When someone create[d] an account in AscendEx, the information [was] captured in . . . [a] management portal, which [was] available to and reviewed by people in the New York office" for many purposes, including monitoring trading. (A-86-87). After creating an account, users could deposit cryptocurrency on AscendEx. That, too, entailed sending information to Manhattan because people in the "New York office" helped manage the "deposit process." (A-87-88). The finance team also reviewed "all of the deposits . . . when they c[a]me in" and performed a "daily reconciliation . . . for all deposits, all withdrawals, and all trades to make sure that what[ was] reflected in [AscendEx's] computer system matche[d] up with what [was] on the internal ledger [the company] maintain[ed]." (*Id.*).

Once a user deposited cryptocurrency on AscendEx, the user could trade, which also involved sending information to Manhattan. AscendEx maintained a

44

"smart order routing engine," which matched buyers and sellers for cryptocurrency trades. (A-89-90). When a buyer and a seller matched, cryptocurrency did not move between those users. Instead, the cryptocurrency stayed in AscendEx's vaults, and AscendEx recorded the trade on an "internal ledger" that kept track of all transactions. (*Id.*). That process took place, in part, in Manhattan because employees in New York managed the internal ledger. (A-90-91). Farrell explained that data from the routing engine went to the "development team" and "finance team" in Manhattan, who used that data to make sure the internal ledger "captur[ed] all the trades" and that "the right amounts [were] credited to all the right users." (*Id.*) The compliance team in Manhattan also received the trading data via the internal ledger, which they used to monitor "concerning patterns" of trading. (*Id.*). Farrell described these activities in Manhattan as "akin to what a broker does" in the "traditional securities" context. (*Id.*).

Eisenberg used each aspect of AscendEx's services during his crime. Eisenberg carried out his scheme on October 11, 2025. At approximately 12:50 a.m. that day, he opened his anonymous account on AscendEx using a tool that made it appear he was in Poland. (A-844, 851). He loaded that account with approximately 10,000 USDT at the time of account opening and another 100,000 USDT at approximately 6:11 p.m. (*Id.*). Between approximately 6:20 and 6:45 p.m., Eisenberg manipulated the price of MNGO Perpetuals, including by executing trades on AscendEx. (A-845-48). Between approximately 6:45 and 7:30 p.m., Eisenberg drained the cryptocurrency from Mango Markets, moving it to other platforms. (A-848-50).

45

Farrell testified that his team in New York identified Eisenberg's manipulation and froze his account the day of the offense. When asked whether, on October 11, 2022, he "learned anything about trading in the Mango token on AscendEx, Farrell replied: "I did. I got a call that evening from a person who was in charge of our client services group," who "was located in New York." (A-98-99). Farrell went on to explain that, because of the call, he personally reviewed MNGO trading on AscendEx—which he saw had "driven up the price of [MNGO] up significantly"—and directed his compliance team to "find out . . . more information about the trading." (A-102). The team was ultimately "able to identify the account that was responsible for the trading," and "the head of client services" gave the instruction to "freeze the account," which resulted in a freeze notification appearing in Eisenberg's AscendEx account at approximately 10:53 p.m. that night. (A-102-03, 865).

Separately, Eisenberg's scheme involved sending misleading price information to, and inflicting losses on, a victim in the District. The cryptocurrency Eisenberg "borrowed" on Mango Markets came from other users who had accounts on the platform. One of those users was John Casey. (A-474-75). Casey testified that, at approximately 6:48 p.m. on October 11, 2022 —right in the middle of Eisenberg's scheme—he was in Poughkeepsie, New York and saw the price of MNGO spike. (A-474-77). Casey had approximately, $2,000 worth of cryptocurrency on Mango Markets at the time, which he tried to withdraw, but was unable to do so because Eisenberg had drained all the cryptocurrency from the platform. (*Id.*).

46

## C. Venue For Wire Fraud Was Proper in the Southern District of New York

The jury was correct to find that venue for wire fraud was proper in the Southern District of New York. Judge Subramanian's decision to the contrary ignored binding precedent.

For venue, the essential conduct in a wire-fraud prosecution is the transmission of a wire because the statute "criminalize[s]" the "act of causing a wire to be transmitted in furtherance of a fraud." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001). A wire can be transmitted through multiple districts, so wire fraud is a "continuing offense" and "venue lies where a wire in furtherance of [the] scheme begins its course, continues, or ends." *Rutigliano*, 790 F.3d at 396; *accord United States v. Percoco*, 13 F.4th 158, 173 (2d Cir. 2021), (finding venue when wire communication was "in furtherance of the scheme"), vacated on other grounds sub nom. *Kaloyeros v. United States*, 143 S.Ct. 2490 (2023). The wire transmission itself does not need to have been fraudulent, so long as it was "incident to an essential part of the scheme" or "a step in the plot." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006). The wire transmission also does not need to be sent by the defendant; it may be sent by a victim or innocent party, so long as the defendant somehow "causes" the transmission. *Kim*, 246 F.3d at 190.

Here, the jury was correct to conclude that Eisenberg caused an interstate wire in furtherance of his scheme to travel into the Southern District of New York. Eisenberg was in Puerto Rico during his crime. (*See* A-626). His registration, funding, and trading on

47

AscendEx each caused wire transmissions to go to AscendEx's office in Manhattan. (A-86-88). The initial account opening sent data to the management portal in Manhattan, including false information that he was located in Poland, because AscendEx did not allow traders who were located in the United States. (A-86-87, 851). The account funding sent data to the internal ledger, which the finance team used to manage inflows and outflows of cryptocurrency to AscendEx. (A-87-88). And Eisenberg's trading was recorded in the company's internal ledger in Manhattan, which AscendEx used to ensure trades were properly recorded and credited to accounts and to review for suspicious trading. (A-90-91). The evidence also established that a team in Manhattan reviewed Eisenberg's manipulative trading in real time because Farrell testified that, on the evening of Eisenberg's scheme, he received a call from a team member in Manhattan identifying the trading as suspicious. (A-98-99, 102-03).

These wire transmissions, independently and together, were sufficient to establish venue. The testimony plainly established that the wires "continue[d] or end[ed]" in the District. *Rutigliano*, 790 F.3d at 396; *accord United States v. Abbas*, 100 F.4th 267, 282-83 (1st Cir. 2024) (collecting cases holding venue for wire fraud lies "wherever the wire transmission at issue originated, passed through, or was received"). And the wire transmissions were "incident to an essential part of the scheme" or "a step in the plot," *Reifler*, 446 F.3d at 95 (2d Cir. 2006), because Eisenberg needed to access, fund, and trade with an account on AscendEx to manipulate the Oracle, and he could not have done so without sending wires to the District. *See, e.g. United*

48

*States v. Tuzman*, No. 21-2229, 2024 WL 1173044, at *4 (2d Cir. Mar. 19, 2024) (finding venue for wire fraud where "circumstantial evidence" showed that "at least one . . . communication[ ] exchanged in furtherance of the fraud scheme was connected to this district"); *United States v. Teman*, No. 21-1920, 2023 WL 3882974, at *1-2 (2d Cir. June 8, 2023) (finding venue for wire fraud where scheme involved data routed to banks in Manhattan).

Judge Subramanian acknowledged the "evidence of wires coming into New York," but concluded that these wires were not sufficient because they were not "essential conduct underlying the offense." (SPA-26-28). That reasoning misapplied Circuit and Supreme Court precedent. The District Court erred in its interpretation of "essential conduct element" in the context of venue for wire fraud. That phrase does not mean that the wire must be "essential" to the scheme. Rather, in venue cases, "essential conduct element" is shorthand for a statutory analysis courts perform to identify "the conduct constituting the offense" at issue. *United States v. Calonge*, 74 F.4th 31, 35 (2d Cir. 2023). For wire fraud, the use of "wires to further the scheme" is one of the "essential elements" that define the conduct constituting the offense. *Weaver*, 860 F.3d at 94. Accordingly, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends." *Rutigliano*, 790 F.3d at 397.

It was legal error for the District Court to require proof that the wire in Eisenberg's case was "essential" to the scheme to defraud. Because the use of an interstate wire is an essential element that must be proven

49

to convict a defendant of wire fraud, it is an "essential conduct element" regardless of whether it is "essential" to the scheme to defraud. Indeed, in interpreting the mail-fraud statute, the Supreme Court has rejected the reasoning on which Judge Subramanian relied. In *Schmuck*, the Court held—in the context of mail fraud —that "[t]o be part of the execution of the fraud . . . the use of the mails *need not be an essential element of the scheme.*" 489 U.S. at 710 (emphasis added). Instead, "[i]t is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Id.* The same principle applies to wire fraud. *See Reifler*, 446 F.3d at 95 (applying *Schmuck* to wire fraud).

This forecloses the District Court's reason for rejecting venue: If the Government can satisfy the interstate-wire element of wire fraud without proof that the wire was an essential element of the scheme, it cannot be the case that the same wire is *insufficient* to establish venue. Rather, as this Court has repeatedly held, the relevant question for venue is whether the wire was in furtherance of the scheme.

What is more, even if the jury had to find that the wires into the District were essential to Eisenberg's scheme (which it did not), the evidence met that high bar. Eisenberg could not have committed his crime without registering for AscendEx, sending cryptocurrency there, and trading on the platform to manipulate the Oracle. None of that was possible without wires going to AscendEx in Manhattan.

Although the AscendEx wires are themselves sufficient for venue purposes, venue was also proper because Eisenberg caused a false signal about the value

50

of MNGO Perpetuals to be sent to Mango Markets users who were the victims of his scheme, include a victim in the Southern District of New York. When an offense involves sending misleading information over the internet, "venue is proper in any district where it is reasonably foreseeable that the material will be accessed." *United States v. Levis*, 488 F. App'x 481, 485 (2d Cir. 2012). Here, Eisenberg's scheme manipulated the public price of MNGO Perpetuals on Mango Markets, as well as the prices on AscendEx, FTX, and Serum that fed into the Oracle. This meant that the misleading price information went to users of Mango Markets. These users were the source of the funds available for borrowing on Mango Markets, and the prices used to value the collateral being offered for that borrowing directly informed their decisions about whether to keep their funds on the platform. One of those victims, John Casey, testified about monitoring the price in real time from the Southern District of New York while Eisenberg perpetrated his scheme, and attempting to withdraw his funds after he suspected that the prices were being manipulated. That evidence is an independent reason that venue was proper in the District. *See United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008) (holding that "misappropriated information" reaching people in District sufficient to establish venue).

### D. Venue For the Commodities Counts Was Proper in the Southern District of New York

The jury was also correct to find that venue was proper in the Southern District of New York for commodities fraud and manipulation. In overturning that

51

judgment, the District Court misapplied relevant Circuit precedent and wrongly refused to defer to the jury's reasonable factual conclusions.

Unlike with wire fraud, the essential conduct element in commodities fraud and manipulation is the scheme to defraud and manipulate. *See Prime Int'l Trading v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019) (prohibition on commodities fraud and manipulation "centers on manipulation in commodities markets"). Because a scheme to defraud or manipulate can occur across districts, these crimes are continuing offenses and can be charged anywhere the crimes were "begun, continued, or completed." 18 U.S.C. § 3237(a). The question, then, is whether Eisenberg "intentionally or knowingly cause[d] an act in furtherance of the charged offense to occur" in the District "or it was "foreseeable to the defendant that such an act would occur . . . and that act [did] in fact occur." *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016).

Venue was proper in the District because Eisenberg's use of AscendEx was a core part of his fraud, and using the platform necessarily caused activity in Manhattan. In the analogous context of securities-fraud cases, this Court has repeatedly held that "utiliz[ing] the facilities of any New York based . . . brokerage firm [is] sufficient to establish venue." *United States v. Dagar*, No. 24-2239, 2025 WL 2553533, at * 3 (2d Cir. Sept. 5, 2025). This Court has found venue in such cases when "part of the process of clearing [the defendant's] trades took place at a data center" in the District and the trades "were written to storage" in Manhattan, *United States v. Buyer*, 2025 WL 855773,

52

at *5 (2d Cir. Mar. 19, 2025), when the defendant executed trades on an exchange in Manhattan, even without a witness who could "say with certainty whether [the] servers that executed the trades were located in New York," *Dagar*, 2025 WL 2553533, at *3, and when the defendant's trades involved brokerages or clearing services based, in part, in the District, *United States v. Chow*, 993 F.3d 125, 133, 143 (2d Cir. 2021); *see also United States v. Khalupsky*, 5 F.4th 279, 292 (2d Cir. 2021) (relying on location of "clearing agent" for trades).

For Eisenberg's scheme, AscendEx's team in Manhattan played a role akin to a brokerage firm in the securities context. (A-90-91). Eisenberg opened and funded his account shortly after midnight on October 11, 2022 (the day of his crime), then added more funds to the account later that day. (A-844). This was crucial to Eisenberg's scheme because he could not have manipulated the MNGO Perpetuals without an account and funds on AscendEx. And from Farrell's testimony, the jury could reasonably infer that these actions involved activity in Manhattan because Farrell explained that every account opening and deposit sent data to teams in Manhattan, which used that data to manage accounts. (A-86-88). The jury also had a firm basis to find that Eisenberg knew his conduct involved activity in Manhattan because when he opened and funded his account, he received multiple emails that had AscendEx's Manhattan address listed at the bottom. (A-630-32); *see Khalupsky*, 5 F.4th at 292 (relying on addresses on mailings in connection with venue).

53

Moreover, the same day he opened the AscendEx account, Eisenberg made manipulative trades on that platform. That, too, involved activity in Manhattan. First, as Farrell testified, whenever a buyer and a seller in a trade matched, that information went to AscendEx's "internal ledger," which was used in Manhattan. (A-149-51; *see* A-90). That information going to Manhattan was a necessary part of every trade. Second, the finance team in Manhattan used that data to perform a trade reconciliation process to make sure that every account ended up being assigned the right amount of cryptocurrency. (A-149-51). And third, the compliance team used the data to monitor for suspicious trading. (*Id.*). Indeed, the trial testimony showed that employees in Manhattan were reviewing Eisenberg's trades essentially in real time because Farrell's team in Manhattan identified the manipulative trading the evening of the crime. (A-98-99, 102-03). In short, trading on AscendEx was a key part of Eisenberg's crime; and trading on AscendEx necessarily caused activity in the District.

In concluding that this evidence was not sufficient to establish venue, the District Court erred as a matter of law and improperly drew factual inferences that a reasonable jury could have rejected. Judge Subramanian dismissed Eisenberg's account opening and deposits as merely "preparatory," rather than part of the crimes. (SPA-7). But the decisions the District Court cited about "preparatory" acts involved entirely different statutes where the criminal conduct was a discrete act—such as visa fraud or misbranding—so any conduct that took place before those misrepresentations or actions was not an element of the crime. *See United*

54

*States v. Ramirez*, 420 F.3d 134, 140-42 (2d Cir. 2005) (visa fraud); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989) (misbranding). Here, by contrast, Eisenberg was charged with commodities fraud and manipulation, which are continuing offenses and did not require proof of a completed fraud for conviction—just fraudulent or manipulative intent and a substantial step in furtherance of the scheme. *See United States v. Abdallah*, 528 F. App'x 79, 82 (2d Cir. 2013) (finding venue for securities fraud based on a substantial step in furtherance of fraud).

The jury had a strong evidentiary basis to conclude that Eisenberg's fraudulent scheme was underway when he created and funded his AscendEx account, and that those actions were crucial to the scheme. *See United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (finding telephone calls were "not merely preparatory" because they were "crucial" to later bribery demand). While one can imagine a situation in which a person uses a long-existing account to perpetrate a scheme to defraud, that is not this case. Here, the scheme unfolded over a single day, meaning that the account creation and funding were so close in time to the crime that Eisenberg plainly opened the account purely to commit the scheme. Moreover, Eisenberg was already acting deceitfully. When he opened the account, he sent AscendEx misleading information suggesting that he was in Poland because AscendEx would not have opened the account if it had known he was in the United States. He also accepted AscendEx's terms of service, which prohibited market manipulation, despite knowing that he intended to use the

55

account for that prohibited purpose. It was reasonable for the jury to infer that these deceitful actions showed that the account opening was part and parcel of the scheme, and Judge Subramanian erred in failing to credit that inference.

The District Court was also wrong to distinguish this Court's securities-fraud venue cases on the grounds that AscendEx's operations in Manhattan were not sufficiently important. (SPA-8). For one, Judge Subramanian drew an arbitrary distinction between Eisenberg's manipulative trading on AscendEx and activity in the District; one cannot be separated from the other because every trade involved sending data to AscendEx's internal ledger in Manhattan.

What is more, the District Court improperly downplayed Farrell's description of the role AscendEx employees in Manhattan had in the trading process. As noted above, in securities-fraud cases this Court has held that trade-process activities performed by brokers —such as clearing and settlement—are sufficient to establish venue when they occur, in part, in the District. *See Chow*, 993 F.3d at 133; *Buyer*, 2025 WL 855773, at \*5; *Khalupsky*, 5 F.4th at 292. Farrell testified that AscendEx's finance team in Manhattan played a role akin to a broker, using the internal ledger to make sure that trades were "credited to all the right users" and to keep track of "who owns what." (A-90-91). Nonetheless, the District Court dismissed his testimony, asserting that making sure trades were credited to the right users was not akin to "clearing" or "settling" a trade. (SPA-8-9.)

56

That assertion reflected a misapprehension of both Farrell's testimony and this Court's precedent. Consistent with the trial testimony in this case, this Court has explained that clearing is "the post-execution reporting and recording of trades, in order to reflect the changing ownership of stocks on a daily basis," and settlement is when "money is exchanged for the transfer of securities." *Chow*, 993 F.3d at 125. That is what AscendEx's Manhattan team did—handling the process of making sure that trades were properly recorded and reported to reflect the changing ownership of cryptocurrency. The District Court had no factual or legal basis to conclude that the jury could not draw the (correct) conclusion that this process is, as Farrell explained, the cryptocurrency equivalent of clearing and settling in the securities context. It follows, then, that because Eisenberg's manipulative trading "utiliz[ed] the facilities of [a] New York based . . . [trading] firm," there was "sufficient [evidence of] venue." *Dagar*, 2025 WL 2553533, at * 3. The District Court should not have concluded otherwise.

Moreover, in addition to performing clearing and settling services, AscendEx's team in Manhattan also ensured people used the platform appropriately. That, too, was an independent basis for venue. This Court has held, in the context of bank fraud, that venue lay in the Southern District of New York when a bank's compliance department reviewed fraudulent checks in the District. *Teman*, 2023 WL 3882974, at *1-2. AscendEx's compliance employees in Manhattan served the same role: They monitored trades for misconduct and could freeze trading if an account appeared to violate AscendEx's terms of use. (A-103). Judge

57

Subramanian distinguished *Teman* on the grounds that the defendant in that case needed to pass a compliance check to gain fraudulent proceeds. But that is no distinction at all. AscendEx's compliance team reviewed his trades, just like the bank's compliance teams reviewed Teman's checks, and Eisenberg needed AscendEx to let the trades go through to carry out his scheme.

Judge Subramanian's concern that this concept would allow venue to lie wherever a compliance officer could stop a crime was misplaced because the involvement of compliance matters only when it is part of the process that constitutes the essential conduct element of the offense at issue. In *Teman*, obtaining the fraud proceeds was part of the essential conduct element, and getting past compliance was necessary to obtain those proceeds. Here, manipulative trading was part of the essential conduct element, and getting those trades to clear through AscendEx was necessary for Eisenberg to use those trades to manipulate the Oracle. But that does not mean that the presence of compliance alone will always be sufficient to establish venue. As always, venue is a fact-intensive analysis based on the particulars of a scheme, and here, the District Court erred in failing to credit the jury's reasonable reading of the facts.

58

## CONCLUSION

**The District Court's decisions should be reversed, and this Court should remand for sentencing on all three Counts.**

Dated:    New York, New York
December 22, 2025

Respectfully submitted,

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

THOMAS S. BURNETT,
PETER J. DAVIS,
NATHAN REHN,
*Assistant United States Attorneys,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,987 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*