# 25-1782

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellant,*

– v. –

AVRAHAM EISENBERG,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICUS CURIAE* NEW YORK COUNCIL OF DEFENSE LAWYERS IN SUPPORT OF DEFENDANT-APPELLEE AVRAHAM EISENBERG**

CHRISTINE H. CHUNG
CHRISTINE H. CHUNG PLLC
33 Park Place, No. 236
New York, New York 10007
(917) 685-0423
christine@thechunglawoffice.com

NOAM BIALE
SHER TREMONTE LLP
90 Broad Street
New York, New York 10004
(212) 202-2600
nbiale@shertremonte.com

HARRY SANDICK
JABARI MATTHEW
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
hsandick@pbwt.com
jmatthew@pbwt.com

CELESTE L.M. KOELEVELD
CLIFFORD CHANCE
375 Ninth Avenue
New York, New York 10001
(212) 878-8000
celeste.koeleveld@cliffordchance.com

*Attorneys for Amicus Curiae*

# TABLE OF CONTENTS

Page


STATEMENT OF INTEREST OF AMICUS CURIAE ........................................... 1

PRELIMINARY STATEMENT ........................................................................ 3

ARGUMENT ................................................................................................. 8

THE DISTRICT COURT'S RULING THAT THE GOVERNMENT FAILED TO PROVE WIRE FRAUD SHOULD BE AFFIRMED ........................... 8

A. The Government's Argument To Affirm The Wire Fraud Conviction Cannot Be Reconciled With Recent Wire Fraud Decisions Of The Supreme Court And This Court ............................... 8

B. The Government's Isolating Of The "Scheme to Defraud" Phrase In Section 1343 And Analogy To Check Kiting Further Expose That No Wire Fraud Was Committed And That Its Definition Of Deceit Is Overbroad ..................................................... 14

CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonilla v. Volvo Car Corp.*,
150 F.3d 62 (1st Cir. 1988)....................20, 21

*Ciminelli v. United States*,
598 U.S. 306 (2023)....................*passim*

*Fasulo v. United States*,
272 U.S. 620 (1926).................... 10, 13-14

*Kelly v. United States*,
590 U.S. 391 (2020).................... 10-11, 14

*Kousisis v. United States*,
605 U.S. 114 (2025)....................5

*Loughrin v. United States*,
573 U.S. 351 (2014)....................6, 17, 18

*McNally v. United States*,
483 U.S. 350 (1987)....................5, 15, 16

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016) ....................8

*Percoco v. United States*,
598 U.S. 319 (2023)....................3

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ....................20

*United States v. Chastain*,
145 F.4th 282 (2d Cir. 2025) ....................3, 5, 11, 12

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022) ....................*passim*

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) ....................8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*United States v. Skelly*,
442 F.3d 94 (2d Cir. 2006) ....................20

*Universal Health Services, Inc. v. United States*,
579 U.S. 176 (2016)....................19

*Williams v. United States*,
458 U.S. 279 (1982)....................18

**Statutes**

18 U.S.C. § 1014....................19

18 U.S.C. § 1341....................5

18 U.S.C. § 1343....................2, 5, 14, 16

18 U.S.C. § 1344....................6, 17, 18

**Other Authorities**

Brief of United States, *Ciminelli v. United States*,
No. 21-1170*,* 2022 WL 10224977 (Oct. 12, 2022) ....................16, 17

Brief of United States, *Loughrin v. United States*,
No. 13-316, 2014 WL 828053 (Feb. 26, 2014) ....................16

2 Sand, Siffert, Loughlin, & Reiss, Modern Federal Jury Instructions
(2025).................... 7, 18, 19-20

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

The New York Council of Defense Lawyers ("NYCDL") is a non-profit organization of approximately 300 criminal defense lawyers, including many former prosecutors and public defenders, whose principal area of practice is the defense of criminal cases in the state and federal courts in New York. Its purposes include supporting the criminal defense function by enhancing the quality of defense representation and taking positions on important defense issues. NYCDL offers the Court the perspective of experienced practitioners who regularly handle some of the most complex federal criminal cases.

NYCDL files this amicus brief in support of the district court's ruling, and Defendant-Appellee Avraham Eisenberg's argument, that the government failed to prove a *sine qua non* of any federal wire fraud prosecution—a false or misleading statement made by the defendant.[2] Despite multiple recent Supreme Court and Second Circuit precedents making clear the obligation of courts to strictly confine

---

[1] Pursuant to Rule 29.1 of this Court's Local Rules, NYCDL certifies that: (1) this brief was authored entirely by counsel for NYCDL, and not by counsel for any party, in whole or part; (2) no party and no counsel for any party contributed money intended to fund preparing or submitting the brief; and (3) apart from NYCDL and its counsel, no other person contributed money intended to fund preparing or submitting the brief.

[2] The parties have consented to the filing of this *amicus* brief. Accordingly, this brief may be filed without leave of court, pursuant to Federal Rule of Appellate Procedure 29(a)(2).

18 U.S.C. § 1343 to its meaning, the government urges this Court to adopt the theory that Eisenberg committed wire fraud by taking actions that were somehow contrary to the "understanding[s]" and "expectation[s]" of an automated cryptocurrency marketplace that imposed no terms or conditions. (G.Br. 31 n.3, 35).[3] In reality, the cryptocurrency marketplace at issue here converted those understandings and expectations into rules and terms only *after* Eisenberg acted. The terms of Mango Markets—which affirmatively touted itself as a *caveat emptor* environment—allowed Eisenberg to claim the funds he did, no matter that his claim may have been unseemly, immoral, or contrary to traditional or common-sense notions of fair play. Characterizing as a "false statement" his act of claiming funds not prohibited by any rule of the marketplace would render the wire fraud statute boundless, including by imposing on transactors everywhere a duty to speak where none could have been divined at the time of their action.

NYCDL submits this amicus brief to prevent the unwarranted expansion of the scope of mail and wire fraud beyond the boundaries that Congress and the courts have set. Other recent Supreme Court and Second Circuit appeals in which NYCDL has filed amicus briefs to oppose the government's use of the mail and wire fraud

---

[3] "A" refers to the Joint Appendix submitted with the government's brief; "SPA" refers to the Special Appendix submitted with the government's brief; and "G.Br." refers to the government's brief on appeal.

statutes to punish conduct outside the bounds of those statutes include *Ciminelli v. United States*, 598 U.S. 306 (2023) (invalidating right-to-control theory of mail and wire fraud, following government confession of error); *Percoco v. United States*, 598 U.S. 319 (2023) (reversing conviction that impermissibly permitted jury to convict non-government official of honest services fraud); *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) (reversing convictions based on insufficiency of government's proof of the making of a false statement in bank and wire fraud prosecution); and *United States v. Chastain*, 145 F.4th 282 (2d Cir. 2025) (jury instructions erroneously permitted wire fraud conviction based on unethical business dealings even if defendant had not misappropriated an interest traditionally considered property).

## PRELIMINARY STATEMENT

The government complains that the district court's grant of a judgment of acquittal on the wire fraud count (Count 3) "lessen[ed] anti-fraud protections simply because a (relatively) new industry is involved." (G.Br. 27). The point is not novelty, but instead that Mango Markets was a highly unusual marketplace, in ways that foreclosed the wire fraud culpability the government sought to impose. Mango Markets advertised itself as being "fully decentralised" (A-731), and as having a "completely permissionless" nature (A-677). Governed only by an organization of MNGO token holders themselves (A-733), Mango Markets had no terms,

conditions, policies, or rules about borrowing (SPA-33). The platform also did not seek to know—and was not even designed either to take or store information about—the source of funds, the *bona fides* of users, or the reasons for borrowing. (A-221, 677). By contrast, it did compel each user to agree to "understand and accept risks" as a part of creating an account. (A-509, 698). The defining features of Mango Markets, as it touted, were the speedy and automatic execution of cryptocurrency trades (A-677), rather than the regulation or management of risk.

The district court correctly ruled that the government failed in its effort to prove that Eisenberg committed wire fraud in this setting. When Eisenberg accessed funds in an amount to which the rules of Mango Markets automatically entitled him, he was not required to make any affirmative representation, and he made none.

Without any falsehood or misrepresentation to point to, the government peppers its brief with arguments that Eisenberg's crime was to "create a misimpression," or to defy some "common-sense expectation," or "common sense understanding" of what "people … expect" in dealings with others. (G.Br. 38, 35, 31 n.3). These arguments cross well over the line of what constitutes wire fraud into an unformed theory of deceit that the Supreme Court and this Court have repeatedly rejected, including because it fails properly to respect Congress' intent or cabin prosecutorial discretion. *See*, *e.g.*, *Ciminelli v. United States*, 598 U.S. at 316 (rejecting "right to control" theory of wire fraud because it would "allow almost any

deceptive act to be criminal"); *United States v. Chastain*, 145 F.4th at 296 (finding erroneous a jury instruction that enabled defendant to be convicted for conduct that "departed from traditional notions of fundamental honesty and fair play," without further limitation).

The government's ultimate resort to arguments based in flat misstatements of the law, moreover, are red flags that Eisenberg's wire fraud prosecution wandered into territory off-limits for federal criminal prosecution. The government argues for the first time on appeal that the "scheme to defraud" language in 18 U.S.C. §1343 means that even in the absence of a false statement or any "misrepresentation of fact," Eisenberg could be convicted because he engaged in "deceptive conduct" that "gave a false impression." (G.Br. 36). But as the government well knows, nearly forty years ago, it lost the argument that the parallel "scheme to defraud" language in Section 1341 should be read disjunctively, such that an outlawed scheme can exist without the "obtain[ing] [of] money or property by false or fraudulent means." *McNally v. United States*, 483 U.S. 350, 358-59 (1987). And thus for forty years it has remained hornbook law that a "false or fraudulent pretense [], representation[] or promise[]" remains a requirement of any mail or wire fraud prosecution. *Kousisis v. United States*, 605 U.S. 114, 123 (2025); *Connolly*, 24 F.4th at 833 ("actual false statement" or "half-truth" is requirement of any fraud scheme).

The government's reliance on analogizing Eisenberg's conduct to check-kiting (negotiating a check drawn on an account with insufficient funds) (G.Br. 38-41) is likewise anchored in a false legal proposition and serves only to expose that there is no wire fraud in this case. Also for the first time on appeal, the government asserts that this Court should read both the bank and wire fraud statutes to criminalize schemes to defraud *not* involving misrepresentations because they "use the same [scheme to defraud] language." (G.Br. 39). But it again fails to cite the Supreme Court case that eviscerates its position. *See Loughrin v. United States*, 573 U.S. 351, 359 (2014) (holding that in the bank fraud statute, unlike the wire fraud statute, the "scheme to defraud" language is disjunctive, such that check kiting can be regarded as a scheme to defraud constituting bank fraud although it cannot properly be regarded as the obtaining of money "by means of false or fraudulent pretenses, representations, or promises"). In its own practice, moreover, the government does not charge check-kiting under the wire fraud statute, or under the "false pretenses" prong of the bank fraud statute, Section 1344(2), but instead solely under Section 1344(1), the prong which outlaws "scheme[s] … to defraud" banks, absent false representations accompanying the act of negotiating the check. If Eisenberg's deceit was akin to that of a check-kiter, as the government asserts, the government never should have charged him with wire fraud. There was no wire fraud.

The definition of half-truth or fraudulent omission to which the government resorts is, in the end, fatally overbroad. When the government relies on what the defendant *failed* to say to prove wire fraud, something must provide the touchstone of what the defendant *needed* to say to avoid a creating or making a "false or fraudulent pretense, representation, or promise." Otherwise, as the norm of *caveat emptor* recognizes, every car salesman becomes a federal mail or wire fraud defendant unless he or she volunteers all information against self-interest (assuming use of a mail or wire). As Judge Sand puts it in his authoritative jury instructions, "[t]he failure to disclose information may also constitute a fraudulent representation *if the defendant was under a legal, professional or contractual duty to make such a disclosure*." 2 Sand, Siffert, Loughlin, & Reiss, Modern Federal Jury Instructions ("Modern Federal Jury Instructions"), ¶ 44.01, Instruction 44-4 (2025) (emphasis added). Here, there were no Mango Markets rules, or obligations imposed by any other source, that obligated Eisenberg to say anything or fill in any purported blanks left by his act of claiming funds.

The government urges this Court to reverse the decision by the district court and in doing so to set a wrong and dangerous precedent. The district court's vacatur of the judgment of conviction on the wire fraud count should be affirmed.

# ARGUMENT

## THE DISTRICT COURT'S RULING THAT THE GOVERNMENT FAILED TO PROVE WIRE FRAUD SHOULD BE AFFIRMED

### A. The Government's Argument To Affirm The Wire Fraud Conviction Cannot Be Reconciled With Recent Wire Fraud Decisions Of The Supreme Court And This Court

The federal wire and mail fraud statutes require a "scheme to defraud" that "employed a falsehood that was 'material.'" *Connolly*, 24 F.4th at 833 (quoting *Neder v. United States*, 527 U.S. 1, 20 (1999) ("well-settled meaning of fraud require[s] a misrepresentation or concealment of material fact") (internal quotations and emphasis omitted)); *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 656 (2d Cir. 2016) (equating fraud with "a knowingly false statement, made with intent to defraud"); *United States v. Rybicki*, 354 F.3d 124, 146 (2d Cir. 2003) (en banc) ("[a] material misrepresentation is an element of the crime") (emphasis omitted).

At the threshold, NYCDL supports Eisenberg's arguments that the district court committed no error in ruling that the government failed to prove that Eisenberg made no false or misleading misrepresentations to Mango Markets or its users. The notion that Mango Market's user guide—which the market's users were not obligated to review or acknowledge (A-509)—provided commands sufficient to define falsity, like the contract between counterparties in *O'Donnell*, 822 F.3d at 658, or the "instruction[s]" of a banking association in *Connolly*, 24 F.4th at 834, defies

logic and over-reads existing legal precedents. The word "borrow" that Mango Markets used as a function button specified the consequence of pushing the button and cannot reasonably have been regarded to create an obligation to repay, in the absence of an obligation otherwise imposed. Nor did Eisenberg misrepresent the value of his collateral on Mango Markets by pressing the button. Mango Markets automatically makes funds available to any user in an amount equal to the collateral value the marketplace holds. It did so in Eisenberg's case, without any misrepresentation being made by him.

Doubtless understanding the frailty of its proof, the government resorts to describing Eisenberg's alleged wire fraud crime as one that "create[d] a 'false impression'" (G.Br. 40), or as one in which Eisenberg acted contrary to implicit "understanding[s]" (G.Br. 33) or "common sense expectation[s]" about the relevant cryptocurrency marketplace (G.Br. 35). The point is to dilute the wire fraud standard to the point where Eisenberg can be guilty of wire fraud even if he made no misrepresentation of fact. (G.Br. 36).

The Court should reject the argument that Eisenberg can be prosecuted without having made a factual misrepresentation just because he engaged in business activity that may be unseemly or unethical. As long as a century ago, the Supreme Court rejected the very proposition advanced by the government here: that every scheme that is "calculated to injure another or to deprive him of his property

wrongfully" falls within the scope of the parallel mail fraud statute. *Fasulo v. United States*, 272 U.S. 620, 628-29 (1926). Yet one need not go back to the 1920's to find law that supports this age-old proposition. The Supreme Court and this Court both have made it clear in recent years and in a variety of contexts that not every "deceptive act" is criminal. *See, e.g., Ciminelli*, 598 U.S. at 315-16 (citing cases). What matters is whether the statute has been violated, and conduct that is abusive or unfair is not necessarily criminal.

The need to confine the wire fraud statute to its accepted meaning was reaffirmed by the Supreme Court just three years ago in *Ciminelli*, where the Court rejected the so-called "right-to-control" doctrine created and followed in this Circuit. This doctrine allowed prosecutors to bring mail and wire fraud charges against those who deprived others of "intangible interests unconnected to traditional property rights." *Ciminelli*, 598 U.S. at 313. Rejecting the doctrine, the Court held that the deprivation of "potentially valuable economic information" was insufficient for a wire fraud prosecution, as it would allow "almost any deceptive act to be criminal," and would also "criminalize[] traditionally civil matters and federalize[] traditionally state matters." *Id*. at 316.

Before that, in 2020, the Supreme Court also rejected a wire fraud prosecution in the "Bridge-gate" case. *See Kelly v. United States*, 590 U.S. 391 (2020). *Kelly* involved retaliation by aides to then-Governor Christopher Christie against a local

politician who refused to endorse Christie's reelection campaign. *Id*. at 395. The Court condemned the defendants for their "abuse of power" that jeopardized the safety of the residents of Fort Lee "[f]or no reason other than political payback." *Id*. at 404. Yet because the defendants' scheme did not seek to deprive anyone of property, a core requirement of the wire fraud statute, the convictions were reversed. The Court explained that the federal fraud statutes do not criminalize all "wrongful[]" conduct, nor may "federal prosecutors use those laws to enact their own norms of integrity." *Id*. at 403-04.

Twice in recent years, this Court has also reversed convictions where the government sought to use the wire fraud statute as a tool to punish unethical behavior that did not otherwise amount to wire fraud. Last year, in *United States v. Chastain*, this Court reversed a wire fraud conviction where the district court instructed the jury that it could convict the defendant if he "conducted himself in a manner that departed from traditional notions of fundamental honesty and fair play in the general and business life of society[.]" 145 F.4th at 295. Chastain worked for an online marketplace that sold non-fungible tokens ("NFTs"), and he selected the NFTs that the marketplace would feature in a section of the website. *Id.* at 287. Knowing that featured NFTs increased in value, Chastain purchased an NFT before he listed it as a featured NFT and then sold it for a profit afterwards. *Id*. For this conduct only, Chastain was convicted of wire fraud. *Id.* at 287-91.

This Court reversed, thoroughly rejecting the district court's sweeping interpretation of the statute. Citing to *Ciminelli*, this Court reasoned that "[i]f the wire fraud statute criminalized conduct that merely departed from traditional notions of fundamental honesty and fair play, 'almost any deceptive act could be criminal.'" *Chastain*, 145 F.4th at 296 (quoting *Ciminelli*, 598 U.S. at 315). Indeed, if the statute covered those kinds of merely unethical behavior, it would "'vastly expand[ ] federal jurisdiction without statutory authorization'" by "mak[ing] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." *Id.* (quoting *Ciminelli*, 598 U.S. at 315). This was not Congress' intent in enacting the mail and wire fraud statutes.

Similarly, in *United States v. Connolly*, this Court explicitly instructed that the mail and wire fraud statutes "are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices." 24 F.4th at 834. The defendants in *Connolly* were Deutsche Bank traders who asked the individual employees who made Deutsche Bank's LIBOR submissions to the British Banking Association ("BBA") to make LIBOR submissions beneficial to their trading positions. *Id*. at 828. The government offered no evidence that the bank's LIBOR submissions violated the BBA's instructions to submit estimates of the rates at which the bank "could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size" on a given day. *Id*. at 825 (internal quotation and emphases

omitted). Instead, the government argued that the bank's LIBOR submissions constituted "half-truths" because the submissions made an "implicit certification" that the bank had a method for determining its submissions, when in fact the defendants had ignored this method "to benefit [the bank's] trades at the expense of their counterparties." *Id*. at 832. The BBA instructions, however, required no certification that traders at a given bank did not influence their bank's submission of the proposed rate to benefit the bank's trading position. BBA rules only expressly prohibited interbank collusion, not "intra-bank" influence. *Id*. at 841-42.

This Court reversed the convictions and rejected the government's theory that the defendants had offered "half-truth[s]" because of a purported "implicit certification." *Id.* at 842. In the absence of a misstatement or a half-truth, there was no wire fraud. This Court recognized that "defendants' efforts to take advantage of [Deutsche Bank's] position as a LIBOR panel contributor in order to affect the outcome of contracts to which [the bank] had already agreed may have violated any reasonable notion of fairness." *Id*. at 843. However, it did not follow that because a transaction is in some sense unfair, it is therefore wire fraud. The government "failed to prove conduct that was within the scope of the statute prohibiting wire fraud schemes." *Id*. Citing to *Fasulo*, this Court explained that a "a mail fraud prosecution is not warranted by the mere fact that the defendant's conduct was

improper, objectionable, or even despicable." *Id*. at 834 (citing *Fasulo*, 272 U.S. at 628)).[4]

Fundamentally, the government's arguments in this appeal cannot be reconciled with the decisional law of the Supreme Court and this Court. Just as the Supreme Court held in *Kelly* that prosecutors may not use the wire fraud statute to enforce their own standards of government ethics, neither may prosecutors use the statute to set ethical standards for a cryptocurrency market that by design lacked any such standards (until after the marketplace identified Eisenberg's conduct and decided to institute new prohibitions). This Court should reject the government's effort to expand the statute to reach conduct that is only unethical or abusive.

### B. The Government's Isolating Of The "Scheme to Defraud" Phrase In Section 1343 And Analogy To Check Kiting Further Expose That No Wire Fraud Was Committed And That Its Definition Of Deceit Is Overbroad

The last two cards played by the government to bolster its other arguments defending the wire fraud conviction rest on clear misstatements of the law. These missteps only further expose that no wire fraud was committed and that the

[4] While the government attempts to turn *Connolly* to its advantage (G.Br. 34-35), the only point of distinction favors Eisenberg. Mango Markets had no rules at all, unlike the BBA, which gave "instructions" to banks that defined permissible submissions and forbade interbank collusion.

government fundamentally misapprehends when juries can infer deceit from a defendant's silence.

For the first time on appeal, the government contends that the wire fraud statute allowed Eisenberg to be convicted of wire fraud, even though the value of his portfolio was "technically accurate" when he withdrew funds, and even though he made no "false representations" about the value of his assets (SPA-32) (district court opinion), because Eisenberg executed a "scheme to defraud" simply by "giving a false impression about his collateral and intentions." (G.Br. 36)). In the government's view, the language in the statute prohibiting "any scheme to defraud" should be read disjunctively to the requirement of "obtaining money or property by means of false or fraudulent pretenses, representations, or promises," such that the wire fraud statute does not require a misrepresentation but reaches a "broader range of deceptive" conduct. (G.Br. 37).

This legal argument is flat wrong and fails in its candor to this Court, as it fails to acknowledge that in *McNally*, a binding precedent the government cites for other purposes (G.Br. 19, 25, 37), the Supreme Court rejected just this disjunctive reading of the same text in the mail fraud statute. Nearly forty years ago, *McNally* held that the requirement of the "obtaining [of] money or property by means or fraudulent pretenses, representations, and promises," should be read conjunctively with the phrase "scheme to defraud" such that every scheme to defraud must satisfy that

requirement. 483 U.S. at 358-59. It so ruled even though "the two phrases identifying the proscribed scheme appear in the disjunctive," and each of the Courts of Appeals that decided the issue until then had read the phrases disjunctively. *Id*. "As we see it," the Supreme Court elaborated, "adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds requiring money or property." *Id*. at 359.

The Solicitor General has acknowledged this ruling—as just one example in 2014 in the government's brief in *Loughrin*. *See Loughrin v. United States,* No. 13-316, 2014 WL 828053, at *29 (Feb. 26, 2014) (Brief of the Solicitor General) (acknowledging that "[t]hree years *after* Congress enacted Section 1344, this Court in *McNally* effectively treated the 'or' in the mail-fraud statute as meaning 'including' because the Court constructed the second clause of the mail-fraud statute as merely codifying an 1872 decision that construed the first") (emphasis in original). Likewise, the government's brief in *Ciminelli*, filed eight years later, described the elements of wire fraud as "requir[ing] the government to show that a defendant, intending to defraud his victim, made material misrepresentations with the object of obtaining money or property." *Ciminelli v. United States,* No. 21-1170*,* 2022 WL 10224977, at *14 (Oct. 12, 2022) (Brief of the Solicitor General). Thus, Section 1343 requires proving the use of "false or fraudulent pretenses,

representations, or promises," in every wire fraud prosecution, *id*. at *15, contrary to the government's assertion in this case.

Also new, and equally erroneous, is the government's assertion that federal prosecutions for check kiting somehow prove that Eisenberg committed wire fraud. Here, the contention is that because both the bank fraud statute and the wire fraud statute "use the same language" in outlawing "schemes to defraud" (G.Br. 39), fraud prosecutions for check kiting—which the government concedes do "not involve[] a false statement"—prove that Eisenberg could properly have been convicted on the wire fraud, even "in the absence of a misrepresentation." (*Id.*).

But here, the government fails to cite yet another adverse precedent that unravels its effort. The Supreme Court decided in 2014, in *Loughrin*, that in the case of the bank fraud statute, 18 U.S.C. § 1344, the phrase prohibiting a "scheme or artifice to defraud a financial institution," in Section 1344(1), *should* be read disjunctively to Section 1344(2), the phrase outlawing a "scheme or artifice to obtain any of the moneys . . . of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 573 U.S. at 355. Thus, despite the similar "scheme to defraud" language and use of "or" in both the bank and wire fraud statutes, the two statutes are not "the same" in the way the government contends; the bank fraud statute outlaws schemes to defraud absent misrepresentations but the wire fraud statute does not. Further, *Loughrin* held that check kiting, because it involves

no false statement or misrepresentation, can *only* be prosecuted under Section 1344(1), absent some misrepresentation that brings the defendant's scheme within the ambit of Section 1344(2). *Id*. at 358 n.4.

These holdings of *Loughrin* are well known to the government. In the NYCDL's experience, and based on a review of the reported caselaw, the government has conformed its charging practices with the *Loughrin* precedent, in that prosecutions that encompass the conduct of check-kiting are pursued under Section 1344(2), or as any form of wire fraud, only when false or fraudulent representations can be proven, apart from the act of depositing the check.[5]

*Ergo*, if, as the government maintains, Eisenberg's "deceit" or "half-truth" was akin to the deceit and half-truth in which check kiters engage (by failing to disclose the insufficiency of the funds in their account when negotiating their checks), Eisenberg did not commit wire fraud. The fact that check-kiters negotiate a written check does not make it a false writing because a check does not "make any representation as to the state of [the defendant's] bank balance." *Williams v. United States*, 458 U.S. 279, 284-85 (1982). Eisenberg's pushing of Mango Markets'

---

[5] *See* Modern Federal Jury Instructions, ¶ 44.01, Instruction 44-4, n.20 (stating that in light of *Williams v. United States*, 458 U.S. 279 (1982), "unless there is some other affirmative misrepresentation apart from the depositing of the check, check-kiting schemes must be prosecuted under the bank fraud statute, 18 U.S.C. § 1344(1), which does not require proof of a false statement.").

"borrow" button was no more false or fraudulent, and thus did not constitute bank fraud.

The fallacy underlying the government's position is a misunderstanding of what is required to prove deceit or half-truth or chicanery—or any of the other phrases the government invokes in trying to water down the standard of a false or misleading statement. Where, as here, the government relies on something unsaid, or a statement the defendant did not volunteer, to establish fraud and the defendant's intent to defraud, the law requires that the context show that the defendant had an obligation to say what he or she left unsaid. There must be some touchstone for assessing falsity or whether a representation is misleading or any assurance implied.

Thus, the Supreme Court in *Universal Health Services*, *Inc. v. United States*, 579 U.S. 176 (2016), a case considering the reach of the statute prohibiting false statements, 18 U.S.C. § 1014, held that omissions can become "misleading half-truths" only against a backdrop of "statutory, regulatory, or contractual requirements." *Id*. at 190. Judge Sand in his Modern Federal Jury Instructions takes the same view of the law applicable to wire fraud, recommending that when the government relies on an alleged failure to disclose information, the district court should instruct the jury that such a failure:

> may also constitute a fraudulent representation *if the defendant was under a legal, professional or contractual duty to make such a disclosure*, the defendant actually knew such a disclosure was required to be made and the

> defendant failed to make such disclosure with the intent to defraud.

Modern Federal Jury Instructions, ¶ 44.01, Instruction 44-4 (emphasis added); *see also United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose.").

In other words, as the district court properly found (*e.g.,* SPA-31) (assessing word "borrow" as used by Mango Markets in absence of "terms" or "negotiations")), context matters. *Autuori*, 212 F.3d at 118 (mail fraud statute prohibits the speaking of "'half-truths' or to omit to state facts necessary to make the statements made, *in light of the circumstances under which they were made*, not misleading") (emphasis added) (quotation and citation omitted). For example, even in a buyer-seller scenario, where there are direct counterparties, the wire fraud statute imposes "no general obligation of the seller to tell the buyer everything negative that the buyer might be interested in learning about the transaction or item to be purchased." *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1988); *see also United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) (holding that under Rule 10b-5 and the "comparable provisions of the wire fraud statute . . . a seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths, but not if he simply fails to disclose information that he is under no obligation to reveal"). And "it would be a truly revolutionary change to make a criminal out of every

reveal negative information … and who—a jury might find—harbored in his heart the hope that the buyer would never ask." *Bonilla*, 150 F.3d at 70. Without the setting of a standard of falsity in a source akin to a contract, professional obligation, or legal duty, there can be no falsity or implied falsity.

In Eisenberg's case, it is undisputed that there was no statute, regulation, contract, professional rule of ethics, or any other source that required him to offer information so as to render his accessing of funds non-fraudulent. Rather, Mango Markets was a paradigm of a *caveat emptor* marketplace, one operating without rules prohibiting what Eisenberg did. This wire fraud prosecution, applied to conduct in a highly idiosyncratic market, was misguided from the outset. It cannot be saved by resort to ignoring binding precedents or the principles those precedents enforce.

## CONCLUSION

This Court should affirm the judgment of the district court vacating the judgment of conviction on the wire fraud count.

Dated: New York, New York
July 31, 2026

Respectfully submitted,

Christine H. Chung
CHRISTINE H. CHUNG PLLC
33 Park Place, No. 236
New York, New York 10007
(917) 685-0423
christine@thechunglawoffice.com

Harry Sandick
Jabari Matthew
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
hsandick@pbwt.com
jmatthew@pbwt.com

Noam Biale
SHER TREMONTE LLP
90 Broad Street
New York, New York 10004
(212) 202-2600
nbiale@shertremonte.com

Celeste L.M. Koeleveld
CLIFFORD CHANCE
375 Ninth Avenue
New York, New York 10001
(212) 878-3051
celeste.koeleveld@cliffordchance.com

*Attorneys for Amicus Curiae New York Council of Defense Lawyers*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), 32(a)(7)(B) and Local Rule 32.1, because it contains 5,040 words, calculated by the word processing system used in its preparation, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: July 31, 2026
New York, New York

PATTERSON BELKNAP WEBB & TYLER LLP

/s/ Harry Sandick

Harry Sandick
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

*Counsel for Amicus Curiae New York Council of Defense Lawyers*