# 25-1782

## United States Court of Appeals
**FOR THE SECOND CIRCUIT**

**Docket No. 25-1782**

UNITED STATES OF AMERICA,

*Appellant,*

—v.—

AVRAHAM EISENBERG,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR THE UNITED STATES OF AMERICA

JAMES M. MCDONALD,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

THOMAS S. BURNETT,
PETER J. DAVIS,
NATHAN REHN,
*Assistant United States Attorneys*

## TABLE OF CONTENTS

PAGE

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT:

POINT I—The Jury Correctly Found that Eisenberg Committed Wire Fraud . . . . . . . . . . . 3

A. Eisenberg Mischaracterizes the Smart Contract and the Fraud . . . . . . . . . . . . . . . . 3

B. Eisenberg Falsely Represented His Intention to Borrow . . . . . . . . . . . . . . . . . . . 5

C. Eisenberg Falsely Represented the Value of His Assets . . . . . . . . . . . . . . . . . . . . 9

D. Eisenberg Executed a Scheme to Defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E. Eisenberg's Fraud Was Material . . . . . . . . 17

POINT II—The Jury Correctly Found that Venue Was Proper . . . . . . . . . . . . . . . . . . . . . . 20

A. Wire-Fraud Venue Was Proper . . . . . . . . . 20

B. Venue for the Commodities Counts Was Proper . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

PAGE

## TABLE OF AUTHORITIES

*Cases*:

*Abouammo v. United States*,
146 S. Ct. 1571 (2026). . . . . . . . . . . . . . . . . . . . . . . 24

*Ciminelli v. United States*,
598 U.S. 306 (2023). . . . . . . . . . . . . . . . . . . . . . . . 17

*McNally v. United States*,
483 U.S. 350 (1987). . . . . . . . . . . . . . . . . . 8, 14, 16

*Neder v. United States*,
527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Schmuck v. United States*,
489 U.S. 705 (1989). . . . . . . . . . . . . . . . . 20, 23, 24

*SEC v. Vali Management Partners*,
No. 21-453, 2022 WL 2155094
(2d Cir. June 15, 2022) . . . . . . . . . . . . . . . . . . . . . 12

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 7

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . 2, 6

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 10

*United States v. Borntovsky*,
879 F.2d 30 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . 23

PAGE

*United States v. Buyer*,
No. 23-7202, 2025 WL 855773
(2d Cir. Mar. 19, 2025) . . . . . . . . . . . . . . 26, 28, 29

*United States v. Chastain*,
145 F.4th 282 (2d Cir. 2025) . . . . . . . . . . . . . . . . 15

*United States v. Chow*,
993 F.3d 125 (2d Cir. 2021) . . . . . . . 26, 27, 28, 29

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022) . . . . . . . . . 4, 5, 14, 15

*United States v. Dagar*,
No. 24-2239, 2025 WL 2553533
(2d Cir. Sept. 5, 2025). . . . . . . . . . . . 25, 26, 28, 29

*United States v. Ferriero*,
866 F.3d 107 (3d Cir. 2017) . . . . . . . . . . . . . . . . . 12

*United States v. Hild*,
147 F.4th 103 (2d Cir. 2025) . . . . . . . . . . . . . . 5, 11

*United States v. Khalupsky*,
5 F.4th 279 (2d Cir. 2021) . . . . . . . . . . . . . . *passim*

*United States v. Kousisis*,
605 U.S. 114 (2025). . . . . . . . . . . . . . . . . 15, 16, 18

*United States v. Lane*,
474 U.S. 438 (1986). . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 27

*United States v. Levis*,
488 F. App'x 481 (2d Cir. 2012) . . . . . . . . . . . . . . 24

PAGE

*United States v. Litvak*,
889 F.3d 55 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . 20

*United States v. Loughrin*,
573 U.S. 351 (2014). . . . . . . . . . . . . . . . . . . . . 16, 17

*United States v. Pacilio*,
85 F.4th 450 (7th Cir. 2023). . . . . . . . . . . . . . 12, 13

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) . . . . . . . . . . . . . . . . 11

*United States v. Ramirez*,
420 F.3d 134 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 28

*United States v. Reifler*,
446 F.3d 65 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 20

*United States v. Reyes*,
302 F.3d 48 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 27

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 18

*United States v. Rutigliano*,
790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 21

*United States v. Stavroulaikis*,
952 F.2d 686 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 16

*United States v. Steffen*,
687 F.3d 1104 (9th Cir. 2012) . . . . . . . . . . . . . . . 14

*United States v. Stephenson*,
895 F.2d 862 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 28

PAGE

*United States v. Teman*,
No. 21-1920, 2023 WL 3882974
(2d Cir. June 8, 2023) . . . . . . . . . . . . 23, 24, 25, 30

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . 8

*Universal Health Services, Inc. v. United States*,
579 U.S. 176 (2016). . . . . . . . . . . . . . . . . . . . . . . . 11

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-1782

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AVRAHAM EISENBERG,

*Defendant-Appellant.*

## REPLY BRIEF FOR THE UNITED STATES OF AMERICA

### Introduction

Avraham Eisenberg stole $100 million of cryptocurrency using age-old fraud techniques. He fraudulently inflated the value of an asset. He used that inflated value to trick a lender into thinking he was a good-faith borrower with sufficient collateral. Then he ran off with the loan proceeds. The jury correctly found that this amounted to wire fraud. And it was right to find that venue lay in Manhattan—Eisenberg used a Manhattan-based exchange and sent manipulated prices to a victim in the District.

In challenging the verdict, Eisenberg assiduously avoids the requirement to "credit[] every inference [the jury] could have . . . drawn in the government's favor" and defer to "its assessment of the weight of the evidence." *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018). He spins a defense to fraud around the operation of the Mango Markets "smart contract," but ignores the evidence that people created that smart contract. Those people designed Mango Markets to require users to represent their intent to borrow, and send information about the value of their collateral, before obtaining a loan. And Eisenberg committed fraud when he misrepresented his intent to borrow and used manipulation to misrepresent his collateral value. Like many websites, Mango Markets ran on software—the smart contract—but the fact Eisenberg's lies caused software to work, instead of a person to act, does not make them truthful.

Eisenberg's contrary theory would radically curtail anti-fraud protections by converting the smart contract—computer code—into an arbiter of truth. If he had carried out his scheme in person, there is little question it would have amounted to fraud. It should not be treated differently just because his misrepresentations caused code designed by people to release funds, rather than causing a person to act. This Court should reject Eisenberg's proposed reshaping of the law and reinstate the verdict.

# ARGUMENT

## POINT I

## The Jury Correctly Found that Eisenberg Committed Wire Fraud

The jury correctly concluded that Eisenberg committed wire fraud. His arguments to the contrary mischaracterize the Government's theory and ignore key facts on which the jury relied.

### A. Eisenberg Mischaracterizes the Smart Contract and the Fraud

Eisenberg's challenge to the verdict rests on a mischaracterization of the fraud and a mistaken view of the smart contract. In his telling, the Government's theory was that Eisenberg "violat[ed] the platform's terms," and there was no violation because the smart contract permitted his scheme. (Br.45-46).[1] Both steps of that argument are wrong.

Eisenberg's fraud was not that he violated Mango's "terms," but that he misrepresented that he was "borrow[ing]" when he intended to steal, and he sent Mango misleading information about the value of his assets. Those representations, individually and together, constituted a fraudulent scheme.

Eisenberg's assertion that, because the "smart contract" did not stop him, there could not have been fraud

[1] All citation formats as in the Government's opening brief.

(Br.48-49), rests on factual conclusions the jury correctly rejected. The smart contract was a computer program. (A-527). Many parts of the economy operate through computer programs, which are routinely designed to have users make representations before the code will act. Users, for instance, may have to provide information to cause a bank's system to transfer funds (A-241-42), or enter personal information to login to a website. Those representations can be false. For instance, users may "[m]isrepresent[ ] [their] identity," and such misrepresentations are "deceptive" even if no human reviews them. *United States v. Khalupsky*, 5 F.4th 279, 291 (2d Cir. 2021). That the code acts on the misrepresentation is not a defense to fraud; it is evidence that the fraudulent scheme succeeded.

The smart contract here was no different. Mango Markets was designed and operated by people. (A-38, 76, 147). Its designers advertised it for "tak[ing] out fully collateralized loans" and required users to represent they were "borrow[ing]" before obtaining one. (A-670, 727-29). The "smart contract" was the "computer program" on which Mango Markets ran, (A-69), akin to "software" on a website, (A-527-29; *see* A-146-47, 241-42). The evidence was more than sufficient for the jury to conclude that the smart contract was simply software designed to act on users' representations. And the fact that making a misrepresentation triggers code does not make it truthful.

Eisenberg's mischaracterization of the fraud and the smart contract culminates in his attempt to shoehorn the case into *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022). (Br.46-48). But the shoe doesn't fit.

*Connolly* concerned whether a response to a "precise [hypothetical] question" was misleading. 24 F.4th at 835-36. That question had detailed instructions about how to answer it, so whether a response was misleading depended on whether the answer ran afoul of the instructions. *Id.* at 841-43. But here, Eisenberg was not answering a hypothetical question with detailed instructions; rather, he was representing an intention to "borrow" and submitting manipulated asset values as collateral. The task for the jury was to decide whether, in context, those representations were "false or deceptive." *United States v. Hild*, 147 F.4th 103, 114 (2d Cir. 2025).

### B. Eisenberg Falsely Represented His Intention to Borrow

Eisenberg's representation that he intended to "borrow" cryptocurrency, knowing that he intended to steal it, was false. The jury reasonably concluded that "borrow" conveyed an intention to maintain sufficient collateral and pay interest until repaying the loan. That conclusion was supported by the plain meaning of "borrow"; the Mango Markets website advertising "collateralized loans" (A-670, 679); the user manual's description of borrowing (A-709-10, 727-30, 744-46); and witness testimony tracking that manual's description (A-46-50, 191-200, 244, 270, 499). It was also corroborated by Eisenberg's description of the stolen funds as "bad debt." (A-697).

Eisenberg claims the jury was wrong about what "clicking 'borrow' conveyed," (Br.52), but his arguments fail to "credit[ ] every inference" supporting the

verdict, *Aquart*, 912 F.3d at 17. His initial argument—that the smart contract does not ask when borrowers will repay—is a red herring. No one argued there was a repayment deadline. Rather, "borrow" conveyed an intent to maintain sufficient collateral and pay interest until repayment. (Gov.Br.22).

Pivoting to the smart contract, Eisenberg claims "borrow" meant only that code would perform certain functions. (Br.52). That argument conflates the representation with code operation. Clicking "borrow" was a representation, which caused code to operate. But the code operating does not make the representation true. Suppose the button had said, "I plan to maintain sufficient collateral and pay interest, until repaying the loan." If Eisenberg clicked that button intending to steal, he would have made a misrepresentation, even if the code issued the loan. The evidence established that "borrow" conveyed the same intention, so clicking it with the plan to steal was fraudulent.

Eisenberg compares the "borrow" request to pressing "play" on a stereo or "brew" on a coffeemaker, (Br.54), but that comparison is inapt. "Play" and "brew" are commands and so cannot be true or false. The jury reasonably concluded that "borrow," in context, was a representation, not a command, because it implied future conduct by the borrower.

Far from supporting Eisenberg's arguments, the code's functioning supports the jury's finding of fraud. Once a user borrowed funds, the software deducted interest and monitored collateral. (A-709-10, 730). This bolsters the inference that borrowing conveyed an intention to pay interest and maintain collateral until

repayment. Failure to do so would result in the "consequence" of "liquidation." (A-244-46). The smart contract enforced obligations; it did not suggest an absence of them. Eisenberg's counter that he did not prevent the code from enforcing those remedies, (Br.52), is irrelevant. Entering a contract with the "intent never to perform" is fraud, even if there are contractual remedies. *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 666 (2d Cir. 2016).

The remaining arguments similarly fail to defer to reasonable inferences the jury drew from the evidence. Eisenberg protests that users did not need to read the user manual. (Br.53). The jury, however, could reasonably conclude that the manual provided context for what borrowing meant. Eisenberg concedes that the manual says borrowers "must maintain a Health Ratio above 0%" and pay interest, or face liquidation. (A-709-10, 730). Even without the word "promise," a reasonable jury could conclude that choosing to "borrow"—when borrowers "must maintain" collateral and pay interest, or face a consequence—conveys an intention to do so. The passages Eisenberg plucks from the manual do not help him. The excerpt about "settling a negative balance" is not about borrowing. (A-766). And the excerpt about "pay[ing] back your liabilities" reinforces that borrowers were supposed to maintain collateral until repaying. (A-709).

This interpretation also aligns with the common definition of "borrow" in financial contexts. (Gov.Br.21). Eisenberg cites a definition of "borrow" as to "appropriate for one's own use." (Br.54-55). But the question is whether the Government's interpretation

is a permissible inference, not whether Eisenberg could have argued for a different one. Eisenberg's definition is also out of place, as it applies in non-financial contexts, such as "borrow[ing] a metaphor from Shakespeare," *Borrow*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/borrow.[2]

Nor was the Government required to prove the existence of a "contractual obligation." (Br.54-57). Wire fraud "reaches everything designed to defraud by . . . suggestions and promises as to the future." *McNally v. United States*, 483 U.S. 350, 357-58 (1987). Such representations can be fraudulent even when *disclaimed* in contracts. *United States v. Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017). So even without a formal contract, the jury could conclude Eisenberg selecting "borrow" was a misleading "suggestion" about how he intended to act.

That Mango Markets was "permissionless" and had a disclaimer does not undermine this conclusion. (Br.48-50). "Permissionless" just meant that "anyone [could] access" Mango Markets without providing personal information. (A-42, 75). There is not a scrap of evidence to support Eisenberg's suggestion that it meant fraud was allowed, and there was testimony to the contrary. (A-76). Likewise, the disclaimer

---

[2] Eisenberg quibbles with how similar borrowing on Mango is to margin and non-recourse loans. (Br.56). But both show that borrowing does not always involve fixed repayment dates and can involve liquidation remedies. (Gov.Br.22-23).

regarding unaudited software flagged the risk of software bugs, not lies. (A-77-78).

In sum, the evidence was sufficient to conclude Eisenberg committed fraud when he represented his intent to "borrow" cryptocurrency, while planning to steal it. His response to the watch hypothetical confirms the point. He concedes that borrowing, with the intent to steal, is fraudulent, even without a loan agreement, repayment deadline, or remedy beyond liquidation. (Br.57). His attempt to distinguish his case because it involved a "decentralized platform," (Br.57), fails. Mango Markets was created and used by people. The jury could reasonably conclude the distinction between borrowing and stealing did not vanish because users interacted through an automated platform.

### C. Eisenberg Falsely Represented the Value of His Assets

The jury also reasonably found Eisenberg committed fraud by misrepresenting his collateral value. (Gov.Br.27-36). Eisenberg repeats the District Court's error in asserting there was no misrepresentation because Mango Markets measured the "actual value of his collateral." (Br.58). In fact, Mango calculated the value using the Oracle, which drew data from three exchanges: AscendEx, FTX, and Serum. (A-341-43). Eisenberg manipulated prices on those exchanges to send misleading information to Mango Markets, via the Oracle. (A-346-48). This meant the Oracle was sending manipulated value, not "actual value." Eisenberg then sent misleading information again when clicking "borrow," which sent information about his

collateral to Mango Markets. (A-531-33). Without those misrepresentations, he never could have "borrowed" vast sums of cryptocurrency.[3]

The jury correctly found the information Eisenberg sent was misleading. Although Eisenberg notes that he never represented "how his collateral attained its value," (Br.58-59), that was not required for fraud. It is equally unlawful "to speak 'half truths' or to omit to state facts necessary to make [a] statement . . . not misleading." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2018). Sending manipulated asset values was misleading because Mango Markets selected sources with anti-manipulation rules and market participants expect prices will not be manipulated. (Gov.Br.30-31).

Eisenberg concedes that Mango relied on exchanges with anti-manipulation rules, but counters that those rules do not matter because the jury had "to consider the perspective . . . of Mango Markets or its users." (Br.61). But that is exactly why the rules matter. The jury heard that *Mango Markets* chose these exchanges precisely because they had "anti-manipulation protection." (A-344-46). This supported the conclusion that—from Mango Markets' perspective—it was misleading to manipulate those exchanges to obtain loans.

---

[3] Eisenberg's observation that borrowers did not have to explain where "funds came from" or "why [they] want to borrow" is irrelevant. (Br.58). Borrowers had to send information about the value of collateral, which Eisenberg misrepresented.

*Universal Health Services, Inc. v. United States*, 579 U.S. 176 (2016), illustrates the point. That case involved federal healthcare reimbursement claims that described "services provided," without disclosing a failure to comply with state "regulatory . . . requirements." *Id.* at 188-90. The Supreme Court found those claims misleading because the recipient "would probably—but wrongly—conclude that the clinic had complied" with those regulations. *Id.* Likewise, Eisenberg sent asset-value information to Mango Markets, which was derived from exchanges that had "contractual requirements" prohibiting manipulation. *Id.* at 190. A reasonable person in the position of Mango, then, "would probably—but wrongly—conclude" the values were not manipulated. *Id.* at 188; *accord Hild*, 147 F.4th at 112 (defendant submitted "above-market" prices where "lenders understood those prices . . . to reflect market value"). Eisenberg again asserts that Mango Markets "measured the *actual* value of [his] collateral," (Br.61), but that mischaracterizes the record: Mango used a tool to measure value, and Eisenberg manipulated the inputs to that tool, knowing Mango would not expect manipulation.

Anti-manipulation rules were not the only reason the jury could reasonably conclude that, from the perspective of Mango Markets, Eisenberg sent misleading information. Market participants do not expect prices will be manipulated. *United States v. Phillips*, 155 F.4th 102, 130-31 (2d Cir. 2025). Eisenberg asserts that market manipulation is "only an abuse of market power," (Br.62-63), but this Court has recognized that manipulation constitutes fraud when it deceives others by "artificially affecting" prices. *SEC v. Vali*

*Management Partners*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. June 15, 2022). In line with this Court's precedent regarding the deceptive nature of manipulation, witnesses testified that they did not expect manipulation. (A-52-54, 265-66, 488-50). Eisenberg exploited that expectation.

Trying to avoid this context, Eisenberg asserts that the question is whether Mango Markets had rules. (Br.59-60). The Court should reject that attempt to add a new requirement to the fraud statutes. Deciding whether a representation is misleading is a "contextual inquiry," and courts uphold fraud convictions even in the absence of rules or terms of service. *United States v. Ferriero*, 866 F.3d 107, 120-21 (3d Cir. 2017). Neither of the decisions Eisenberg cites require a different result. *Connolly* concerned a hypothetical question with detailed instructions. Because the instructions prohibited some considerations, but not others, this Court determined that considering a non-prohibited factor was not fraudulent. That does not mean rules or instructions are always required. And *United States v. Pacilio*, 85 F.4th 450 (7th Cir. 2023), undercuts Eisenberg's argument. There, the Seventh Circuit concluded it was fraudulent for a trader to place an order on an exchange, intending to cancel. *Id.* at 460-61. The exchange had no rule explicitly addressing that scenario—just a general prohibition on fraud and manipulation. *Id.* at 457. But the court admitted testimony from exchange representatives and others regarding their "understanding" of the rule, which provided context for finding the scheme was misleading in light of "the expectation of market participants." *Id.* at 465. *Pacilio* reinforces that platform rules are not

dispositive; the context matters. And here the jury reasonably considered the relevant context by considering how Mango Markets selected the exchanges feeding the Oracle and testimony from Mango Markets designers and users.

Finally, Eisenberg claims Mango Markets encouraged manipulation, citing a user-manual passage about "develop[ing] strategies based on [users'] project of market movements." (Br.59). That misreads a typo in a section about the "Risk Calculator," which allowed users to "simulat[e]" market movements. (A-736). The context makes it clear the sentence contains a typo: It explains the tool can be useful to "develop strategies based on [users'] project[ion] of market movements," (A-736), but incorrectly says "project" instead of "projection." A reasonable jury would not be required to accept Eisenberg's reading of this sentence. In fact, Eisenberg's reading is so implausible that he never advanced it to the jury.

### D. Eisenberg Executed a Scheme to Defraud

Choosing to "borrow" and sending misleading asset values were misrepresentations. That is enough to resolve this case. But even if they were not, together they formed a scheme to defraud by deceiving Mango Markets into issuing Eisenberg massive loans. (Gov.Br.36-41).

Eisenberg does not contest that, if conduct can amount to a scheme to defraud, his scheme was fraudulent. Instead, he argues that wire fraud is limited to "false or fraudulent representations, pretenses, or promises." That reading eliminates "scheme or artifice

to defraud" from the statute and does not comport with the common law or wire-fraud precedent. Conduct can communicate information and be misleading. That is why common-law fraud is not limited to words, but encompasses "any conduct that amounts to an assertion not in accordance with the truth." Rest. (Second) of Torts § 525.

Consistent with this principle, this Court and the Supreme Court have recognized that "the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception." *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022); *accord McNally*, 483 U.S. at 358 ("[T]he words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching."). Eisenberg does not engage with the weight of authority adopting this view, (Gov.Br.37-38), nor does he contest that deceptive conduct can amount to wire fraud in many contexts, including misappropriation of business information, embezzlement, placing trades with intent to cancel them, exploiting slot-machine algorithms, and rolling back odometers. (Gov.Br.39-40); *see United States v. Steffen*, 687 F.3d 1104, 1114 (9th Cir. 2012) (fraudulent concealment).

None of the decisions Eisenberg cites undermine this principle. Eisenberg cites passages from *Neder* and *Kousisis* that omit the "scheme to defraud" language. (Br.63-64). But those decisions did not address whether deceptive conduct could amount to wire fraud; rather, they focused on statements because those cases

involved misstatements. *Neder v. United States*, 527 U.S. 1, 1 (1999); *United States v. Kousisis*, 605 U.S. 114, 119-22 (2025). Indeed, *Kousisis*, like *McNally*, reaffirmed the common-law understanding of fraud as encompassing any form of "deception" to obtain money or property. *Id.* at 121.

Eisenberg's reliance on *Connolly* and *Chastain* is similarly misplaced. (Br.64-65). *Connolly* rejected the requirement of showing a false statement. 24 F.4th at 833-34. Eisenberg and the amicus carefully snip language from *Connolly* to claim that it held the government must show "'actual false statement[s]' or 'half-truth[s].'" (Br.64; Amicus-5). But the full quote is "the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception," and then offers "a half-truth" as an example of a deceptive scheme, but not an exclusive one. 24 F.4th at 833-34. And *Chastain* disapproved a jury instruction mentioning "traditional notions of fundamental honesty and fair play," but reaffirmed that conduct—in *Chastain*, misappropriating business information—can constitute fraud. *United States v. Chastain*, 145 F.4th 282, 295-96 (2d Cir. 2025).

Eisenberg also misstates the import of decisions stating the wire-fraud statute should not be read in the "disjunctive." (Br.64). Those cases establish the "money-or-property requirement" applies to all wire-fraud schemes. *Kousisis*, 605 U.S. at 121. They do not hold that a "scheme or artifice to defraud" means the same thing as "fraudulent pretenses, representations, or promises." *See id.* In fact, the second prong was

added to confirm the breadth of the wire-fraud statute. *McNally*, 483 U.S. at 356-57.[4]

The bank-fraud statute exposes the flaws in Eisenberg's argument. He concedes that for bank fraud, a "scheme or artifice to defraud" extends beyond misleading statements. (Gov.Br.39-40). That confirms that schemes to defraud are not limited to those involving misstatements. "Congress modeled the bank fraud statute upon the mail and wire fraud statutes," intending all three to have the same breadth. *United States v. Stavroulaikis*, 952 F.2d 686, 694 (2d Cir. 1992). There is no legal or textual reason to interpret "defraud" differently between them.

*United States v. Loughrin*, 573 U.S. 351 (2014), does not support Eisenberg's attempt to draw a distinction between the word "defraud" in those statutes. (Br.66). *Loughrin* held bank fraud requires proof of "inten[t] to defraud a bank" in a scheme to defraud, but not in a scheme based on fraudulent pretenses, representations, or promises. *Id.* at 353. In reaching that result, the Court explained that in the wire-fraud

---

[4] The amicus brief does not add anything substantive to Eisenberg's argument, but hyperbolically accuses the Government of lacking candor in its discussion of *McNally*. (Amicus-15). That is wrong. *McNally* held the "money-or-property" requirement applies to both prongs of the wire-fraud statute. It did not disturb the decades of precedent (pre- and post-*McNally*) recognizing that deceptive conduct to obtain money or property is fraud. (Gov.Br.36-38).

statute, unlike the bank-fraud statute, the "money-or-property" requirement applies both to schemes to defraud and misrepresentations. *Id.* at 360-61. But the Court never considered, much less held, that "defraud" in the wire-fraud and bank-fraud statutes have different meanings.[5]

There is nothing "boundless," (Br.1), about reading "defraud" consistently with the common law and longstanding precedent. Nor would the Government's theory suggest that any "unseemly or unethical" business activity is criminal. (Amicus-9). Rather, under settled law, wire fraud extends to deceptive conduct that targets money or property, and Eisenberg's scheme was fraudulent on that basis as well.

### E. Eisenberg's Fraud Was Material

The jury correctly concluded that Eisenberg's fraud was material—a decision Judge Subramanian affirmed in the commodities-fraud context. (SPA-34-35). Eisenberg resists that conclusion, arguing that Mango Markets operated automatically, (Br.68-71), but his argument misapprehends the law and the record.

---

[5] *Ciminelli v. United States*, 598 U.S. 306, 315-16 (2023), does not "repudiate[ ]" the theory that deceptive acts can be wire fraud. (Br.67). Rather, *Ciminelli* reaffirmed that the wire-fraud statute does not reach "deceptive actions" that target interests unconnected to property, which implicitly recognizes the statute does apply to deceptive actions that do target money or property. *Id.*

Materiality distinguishes insignificant misstatements from fraud. *Kousisis*, 605 U.S. at 131. "[A] misrepresentation is material if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Id.* Here, the jury correctly found that Eisenberg's fraud was material. The Mango Markets designers required users to represent they were "borrow[ing]" before obtaining a collateralized loan. They also programmed Mango to use the Oracle to ensure borrowers had enough collateral. Because of this design, Eisenberg's misrepresentations were not only important to Mango Markets—they were essential. He could not have obtained *any* cryptocurrency without misrepresenting his intention to "borrow." And he could not have obtained the amount he did without manipulation.

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), supports a finding of materiality. There, a bank had a formula for setting interest rates, whereby the rate would "automatically" change based on certain leverage thresholds. *Id.* at 233-36 & n.35. This Court held that, because the formula was automatic, a misrepresentation about leverage would be material if it "resulted in the [borrower] being in a different category." *Id.* at 235. By the same logic, Eisenberg's misrepresentations were material. Misrepresenting his intention to "borrow" is what allowed him to obtain cryptocurrency. He otherwise would have been unable to do so; there was no "steal" button. Similarly, misrepresenting his asset value inflated the amount he could take.

Unable to dispute these facts, Eisenberg reframes the issue as whether Mango Markets could have taken "alternative action had it received full information." (Br.70-71). But that framing is wrong: the question is whether the "*false statement*"—here, the "borrow" representation and inflated asset value—"is capable of influencing[ ] the decision." *Neder*, 527 U.S. at 16 (emphasis added). Moreover, the reason Mango Markets could not take different action if it "received full information" is because there was no mechanism to send additional information. If that were enough to defeat materiality, fraud would be fair game on essentially any automated system. Fraudsters could use false information to access accounts, transfer money, or cash forged checks simply because the misrepresentation causes an automated system to operate, and there is no mechanism to provide qualifying information.

The evidence also established that Eisenberg's misrepresentations were material to Mango Markets designers and users, who testified that it would have mattered if a user was manipulating asset values or borrowing without intending to maintain collateral and pay interest. (A-49-54, 265-70, 488-90). Mango Markets' reaction to the fraud—pausing the entire platform—underscores the importance of Eisenberg's misrepresentations. (A-73-74). Eisenberg's only response is that his fraud happened too fast for victims to react. (Br.71-73). But the idea that, if a fraud happens fast enough, it cannot be material, is misguided. Materiality is an "objective" standard focused on what would be important to know, not a practical question about whether victims responded too slowly. *United States v. Litvak*, 889 F.3d 55, 66 (2d Cir. 2018). And

Eisenberg again misreads the record. For example, the evidence showed users could withdraw their funds with the click of a button, and so could have protected themselves if they knew Eisenberg's scheme was ongoing. (A-474-77). That the victims noticed the fraud too late does not make it immaterial.

## POINT II

## The Jury Correctly Found that Venue Was Proper

The jury reasonably found that venue on all counts was proper. Eisenberg's arguments ignore precedent and fail to credit reasonable inferences the jury drew from the evidence.

### A. Wire-Fraud Venue Was Proper

The jury reasonably concluded that wire-fraud venue was proper. Eisenberg runs from the District Court's reasoning, conceding that wires establishing venue must be "in furtherance" of the scheme, not "essential" to it. (Br.39-40). And he acknowledges (in a footnote) that the "in furtherance" standard is met whenever a wire transmission "was incident to an essential part of the scheme or a step in the plot." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006); *accord Schmuck v. United States*, 489 U.S. 705, 710 (1989).

Under that standard, the jury reasonably found that wires Eisenberg sent to Manhattan furthered his fraud. Eisenberg created an AscendEx account, deposited funds, and then traded on AscendEx, all of which were essential parts of his scheme. Each required sending wires to Manhattan. Account-creation sent

data to a "management portal" in "New York"; depositing cryptocurrency sent data to an "accounting system" used "in the New York office"; and every trade was automatically recorded in AscendEx's "internal ledger" in "New York." (A-86-91).

Eisenberg's scattershot responses do not undermine the jury's conclusion. His observations that he was in Puerto Rico, that AscendEx was incorporated in Romania, and that he did not store cryptocurrency in New York, (Br.37-38), have nothing to do with where wires travelled. And his argument that Manhattan employees only "retroactively" monitored his account, (Br.38-39), fares no better. The question is whether a wire furthering the fraud travelled to the District, *see United States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015), and Eisenberg caused wires to travel to Manhattan simultaneously with each action on AscendEx.

Eisenberg opened, and began funding, his AscendEx account at 12:50 a.m. on October 11, 2022. (A-844, 851). This instantly sent data to the District because AscendEx's general counsel, James Farrell, testified that account-creation information is "captured in" the management portal and deposits are automatically recorded in "an internal accounting system," both of which were used in New York. (A-87-88). Eisenberg's trading—which began at approximately 6:20 p.m.—also instantly sent wires to the District because, as Farrell explained, trades involved an order matching on a routing engine, which was "synced" to the "internal ledger" used in New York for recording trades. (A-89-91).

Because the focus of the wire-fraud statute is the wires, when or even whether employees used that information is irrelevant. But the evidence also showed Manhattan employees used that information during the crime. For account-creation and funding, Manhattan employees reviewed deposits "when they c[a]me in" and conducted "daily reconciliation" for "all deposits, all withdrawals, and all trades." (A-88). For the trading, employees in Manhattan spotted Eisenberg's manipulative trading while it was occurring. (A-90-91, 98-99, 102-03).

Eisenberg asserts his fraudulent trading was not noticed until "four hours after" the trades, (Br.39), but he misreads the record. Manhattan employees did not *freeze* his account until 10:53 p.m., but they spotted the problem earlier. Farrell received a call about the trading in the "evening," and there was delay between the call and the freeze because he directed the team to investigate. (A-98-99, 102). Farrell also testified that he personally "reviewed the data" and saw the price of MNGO had been "driven . . . *up significantly*." (A-102 (emphasis added)). Eisenberg's trading on AscendEx had two legs—first buying to increase the price, then selling to decrease it—so Farrell's testimony indicates he saw the trading while the scheme was in progress.

Moreover, Eisenberg's scheme was not complete when AscendEx froze his account. At that time, he was negotiating with Mango Markets, (A-697), to "postpone [its] complaint to the authorities," *United States v. Lane*, 474 U.S. 438, 451-52 (1986), and the jury could reasonably conclude that AscendEx's investigation

into the manipulation could bear on those negotiations.

Taking a different tack, Eisenberg claims that wires to Manhattan furthered AscendEx's operations, not the fraud. (Br.40). That is a false distinction. Using AscendEx was essential to Eisenberg's scheme, so wires that furthered AscendEx's operations furthered the fraud. *See United States v. Borntovsky*, 879 F.2d 30, 40 (2d Cir. 1989) (mailing furthered fraud when it was "part of the business of processing a claim" involved in the scheme); *United States v. Teman*, No. 21-1920, 2023 WL 3882974, at *2 (2d Cir. June 8, 2023) (wire for anti-fraud review established venue). Indeed, the wires to Manhattan were inseparable from the fraud. Creating and funding an account necessarily meant sending information to the management portal and accounting system. (A-87-88). Likewise, every trade sent data to the internal ledger. (A-89-91). And Eisenberg's scheme depended on having a funded account and trading on AscendEx, so wires sent to enable those operations were in furtherance of the scheme.

*Schmuck* supports this conclusion, explaining that "routine mailings that are innocent in themselves" can further a fraud, and that title transfers furthered fraud because "a failure of this passage of title would have jeopardized" the scheme. 489 U.S. at 714-15. Similarly, Eisenberg's scheme could not have occurred without his AscendEx trading, which he could not have performed without wires going to Manhattan. That is far different from the cases *Schmuck* distinguished, where the communications at issue involved "post-fraud accounting among . . . victims." *Id.*

The claim that AscendEx wanted to thwart the fraud, (Br.41), does not change the analysis. This Court rejected a nearly identical argument in *Teman*, finding that checks going to a fraud-review team at a bank in Manhattan furthered a fraudulent scheme because the bank needed to approve the checks, even if it "intended to defeat . . . the fraud." 2023 WL 3882974, at *2; *accord Schmuck*, 489 U.S. at 715. Similarly, Eisenberg needed to use AscendEx's system, even if AscendEx did not want manipulation. He had to send wires to Manhattan to create and fund an account, then trade. And as in *Teman*, AscendEx had to permit his use of the system—rather than freeze his account —for Eisenberg's scheme to succeed.

Venue was also proper because Eisenberg's manipulation caused misleading information to go to Mango Markets users, including in the District. Eisenberg's argument that this was not "a conduct element of wire fraud," (Br.42), is foreclosed: This Court has held that sending information online is a wire wherever the information is "accessed." *United States v. Levis*, 488 F. App'x 481, 485 (2d Cir. 2012). Eisenberg's citation to *Abouammo v. United States*, 146 S. Ct. 1571 (2026), is inapposite. *Abouammo* interpreted the "essential conduct elements" of the "specific crime charged." *Id.* at 1577, 1579. For wire fraud, the essential conduct is "caus[ing] [wires] to be transmitted" interstate, 18 U.S.C. § 1343. Sending misleading price information to Mango Markets users furthered Eisenberg's fraud. Those users were the source of the cryptocurrency Eisenberg "borrowed." The jury reasonably could conclude that, just as manipulation deceived Mango

Markets into issuing loans, the same manipulation tricked users into leaving assets to be lent.

It was also reasonable for the jury to find that it was foreseeable that Eisenberg's scheme involved sending a wire to the District. Each time Eisenberg deposited funds, he received emails from AscendEx with a Manhattan address, (A-630-32), making it foreseeable that his deposits and trades involved wires to the District. *See Teman*, 2023 WL 3882974, at *2 (address on check made venue foreseeable); *Khalupsky*, 5 F.4th at 292 (address on statements). It was also foreseeable that Eisenberg's scheme would send misleading price information to Mango Markets users in the District—Eisenberg was a sophisticated trader who knew his scheme involved "borrowing" funds from all users of the platform, which was widely available. *See Khalupsky*, 5 F.4th at 292 ("vast scope of trading scheme" made venue foreseeable). On these facts, it was reasonable for the jury to find venue in the District was foreseeable.

### B. Venue for the Commodities Counts Was Proper

The jury also reasonably concluded that venue on the commodities counts was proper because Eisenberg "utilize[ed] the facilities of" AscendEx in Manhattan. *United States v. Dagar*, No. 24-2239, 2025 WL 2553533, at *3 (2d Cir. Sept. 5, 2025). Eisenberg's formalistic argument that AscendEx was incorporated in Romania, (Br.24-25), is meritless. Venue lies where the "acts constituting the crime occurred," so what matters is the location of the business operations

Eisenberg utilized. *See United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021) (venue based on where NASDAQ was headquartered and where trades were executed, cleared, and recorded); *United States v. Buyer*, No. 23-7202, 2025 WL 855773, at *5 (2d Cir. Mar. 19, 2025) (same). Formalities aside, AscendEx operated from Manhattan: Two-thirds of the people who ran it worked there, including the founders and critical teams. (A-82).

Each step of Eisenberg's scheme utilized AscendEx's operations in Manhattan. Account-creation and funding sent information to AscendEx's management portal and accounting system in Manhattan. (A-87-91). This constituted activity in the District that furthered the crime: Eisenberg could not have executed his scheme without a funded account.

Resisting this reasonable conclusion, Eisenberg incorrectly frames the issue as whether "employees in Manhattan" played a role in account-creation and funding. (Br.26-27). Venue is not limited to where people acted; it includes where electronic activity occurred. *See Chow*, 993 F.3d at 143 (trade-data "recorded" in Manhattan); *Buyer*, 2025 WL 855773, at *5 (trades "written to storage" in Manhattan); *Dagar*, 2025 WL 2553533, at *3 (trader "utiliz[ed] the facilities" of Manhattan-based firm). Even if employee activities mattered, Manhattan employees reviewed deposits "when they c[a]me in" and conducted "daily reconciliation . . . for all deposits." (A-88).

Eisenberg argues this review happened sometime after his account was opened and funded, (Br.27), but that is beside the point: Farrell's testimony confirms

that account-creation and funding sent data to Manhattan, and Manhattan employees promptly used that information to perform administrative activities that were part and parcel of that process. The distinction Eisenberg draws between activities that furthered AscendEx's business, and those that furthered his crime, (Br.26), is a false one. When a crime utilizes trading facilities, venue is proper where those business operations occur. *See, e.g.*, *Chow*, 993 F.3d at 134, 143 ("clearing and other administrative service" establish venue); *Khalupsky*, 5 F.4th at 292 (activities of "clearing agent").

Eisenberg cannot bolster his argument with Judge Subramanian's reference to interview notes. (Br.27). The notes were not trial evidence and thus improper to consider on a Rule 29 motion. *United States v. Reyes*, 302 F.3d 48, 52-53 (2d Cir. 2002). The defense could have questioned Farrell on the notes, but did not, and for good reason: Eisenberg misreads the notes he cites, which were consistent with Farrell's trial testimony. (Dkt. 208 at 7-8). Moreover, those notes—and others Eisenberg ignores—were replete with information showing Eisenberg's crime involved activity on AscendEx in Manhattan. (*Id.*).

The assertion that account-opening and funding were merely "preparatory" (Br.28), is also wrong. Eisenberg does not contest that his crime was already underway: Those activities occurred just hours before his trading began and involved him misrepresenting his location and intention to comply with AscendEx's terms of service. *See United States v. Lange*, 834 F.3d 58, 72 (2d Cir. 2016) (activities not preparatory when

"crucial" to the scheme). His analogies to cases involving visa fraud and misbranding fail because, regardless of whether those statutes are continuing offenses, they criminalize discrete acts, such as making a false statement or delivering misbranded products. *United States v. Ramirez*, 420 F.3d 134, 140-41 (2d Cir. 2005). The commodities and wire-fraud offenses are more capacious, criminalizing acts in furtherance of fraudulent and manipulative schemes, so acts that "were crucial" to the schemes are sufficient for venue. *United States v. Stephenson*, 895 F.2d 862, 874-75 (2d Cir. 1990).

Eisenberg's trading on AscendEx also involved activity in Manhattan. Eisenberg's arguments to the contrary misunderstand trading. (Br.33-34). Trading consists of execution, which is when a buyer and seller are matched; "[c]learance," which is "the post-execution reporting and recording of trades"; and settlement, which is when "money is exchanged." *Chow*, 993 F.3d at 134. Post-execution clearance and settlement are part of trading and can establish venue. *See, e.g.*, *id.* at 143; *Buyer*, 2025 WL 855773, at *5; *Khalupsky*, 5 F.4th at 292. Contrary to Eisenberg's assertion, (Br.28-29), Farrell's testimony showed that Eisenberg's "trades were cleared and settled in part by a Manhattan-based firm" on computers in the District. *Dagar*, 2025 WL 2553533, at *3. All executed trades were "reflected in [the] internal ledger" and the ledger was where assets moved "from one person's account to another." (A-89-91).

None of Eisenberg's responses justify upsetting the verdict. He again draws a distinction between people

and systems, claiming that data automatically went to the "internal ledger," without action by employees. (Br.34-35). But proving venue does not require human involvement. Just as trades being "written to" computers in Manhattan establishes venue in the securities context, trades being recorded on Ascendex's ledger is sufficient. *Buyer*, 2025 WL 855773, at *5. Similarly, there is no evidence to support Eisenberg's assertion that his "scheme was complete" once the "routing engine executed [his] trades." (Br.34). Rather, the record showed that the ledger was "synced" with the routing engine and was how AscendEx kept track of every trade. (A-90). And the Oracle drew its data from transactions that AscendEx reported. (A-337-42). The jury was also correct to find that the ledger was, in part, in Manhattan: Regardless of where the server was located, Farrell's testimony established that the ledger appeared on computers at the Manhattan office. *Dagar*, 2025 WL 2553533, at *3 (server location "not dispositive" to venue).

Eisenberg also errs in downplaying the role of Manhattan employees in the trade process. Manhattan employees ensured the ledger "capture[d] all of the trades" and "the right amounts [were] credited" to users. (A-91). That is nearly identical to the definition of clearing in *Chow*. 993 F.3d at 134. Eisenberg characterizes this conduct as retroactive, (Br.35), but clearing and settlement *always* occur "post-execution," yet suffice for venue. *Chow*, 993 F.3d at 134. And as noted, Farrell's testimony showed that Manhattan employees were reviewing Eisenberg's trades during his scheme. (A-102-03). That those employees were trying to "defeat . . . fraud" is irrelevant. *Teman*, 2023 WL 3882974,

at *2. Similar to the check approval in *Teman*, Eisenberg needed the continued approval of AscendEx to carry out his scheme because the company could freeze his trading. (A-103).

Finally, the jury had a reasonable basis to conclude Eisenberg knew about, or could reasonably foresee, AscendEx's Manhattan operations. Eisenberg was a sophisticated trader, who paid close attention to information about the platforms he used in his scheme. (A-582-612). And each time he made deposits, he received an email from AscendEx listing a Manhattan address. (A-630-32).

Eisenberg grasps for any possible inferences in his favor, contravening the legal standard. His observation that AscendEx was incorporated in Romania and used a Singapore choice-of-law provision, (Br.31), is irrelevant to where the trading operations occurred. Moreover, the idea Eisenberg would know about legal incorporation and choice-of-law provisions concedes he paid close attention to details and would have identified the Manhattan address. Eisenberg's arguments that Manhattan employees may not have worked at that address, and that the emails were not specific about which activities occurred in Manhattan, (Br.32), are similarly off-base. The test is reasonable foreseeability, and the address put Eisenberg on notice of AscendEx's operations in Manhattan regardless of whether it was the precise location of the Manhattan employees. *See Teman*, 2023 WL 3882974, at *2; *Khalupsky*, 5 F.4th at 292. This Court has never required knowledge of the specific activities occurring in the District, finding it sufficient that the defendant knew

or could reasonably foresee his trading involved "Manhattan-based" entities. *Id.*

At bottom, Eisenberg knew, or could reasonably foresee, that AscendEx had operations in Manhattan, and Farrell accurately explained those activities were "akin to what a broker does in a traditional securities" context. (A-91). Eisenberg and Judge Subramanian treat that statement dismissively, (Br.34-35), but the jury was not required to take their dim view of sworn testimony from AscendEx's general counsel. Farrell's detailed description of AscendEx's operations was consistent with this Court's securities-fraud decisions. The verdict should be reinstated.

## CONCLUSION

**The District Court's decision should be reversed and the case remanded for sentencing.**

Dated: New York, New York
August 28, 2026

Respectfully submitted,

JAMES M. MCDONALD,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America.*

THOMAS S. BURNETT,
PETER J. DAVIS,
NATHAN REHN,
*Assistant United States Attorneys,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 7,000 words in this brief.

JAMES M. MCDONALD,
*United States Attorney for the Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*